306 Ga. 252
FINAL COPY

S19A0146.  WILKES & McHUGH, P.A. et al. v. LTC
CONSULTING, L.P. et al.

BOGGS, Justice.

This case presents the first opportunity for this Court to consider the effects of the General Assembly's wholesale revision in 2016 of the anti-SLAPP statute, OCGA § 9-11-11.1, which now substantially mirrors California Code of Civil Procedure § 425.16. We vacate the trial court's denial of the defendants' anti-SLAPP motion at issue in this case, and we remand the case with direction to reconsider the motion under the proper standards.

LTC Consulting, L.P. and two affiliated entities sued law firm Wilkes & McHugh, P.A. and one of its attorneys for violations of OCGA § 31-7-3.2 (j), deceptive trade practices, and false advertising after the defendants ran full-page advertisements in local newspapers targeting patients of nursing homes owned by the plaintiffs. The defendants filed a Motion to Dismiss or to Strike

Pursuant to OCGA §§ 9-11-11.1 and 9-11-12 (b) (6), arguing among other things that OCGA § 31-7-3.2 (j), which was enacted in 2015, violates the First Amendment. See Ga. L. 2015, p. 1315. The motion was filed the day before a previously scheduled injunction hearing, but the trial court considered the defendants' motion and denied it. The defendants appealed to the Court of Appeals, which properly transferred the case to this Court.

We conclude that the defendants met their burden under OCGA § 9-11-11.1 to show that the plaintiffs' claims are ones arising from acts that could reasonably be construed as acts in furtherance of the defendants' right of free speech under the United States Constitution in connection with an issue of public interest or concern, thereby triggering the application of OCGA § 9-11-11.1. The burden then shifted to the plaintiffs to establish that there was a probability that they would prevail on their claims. However, in analyzing these claims, the parties did not argue, and the trial court did not properly apply, the new standards for anti-SLAPP motions explained in more detail below. In particular, the parties and the

trial court overlooked certain preliminary questions, which also have not been adequately briefed here. We are reluctant to address these questions in the first instance without affording the trial court an opportunity to consider them with adequate briefing from the parties. Accordingly, we vacate the trial court's denial of the defendants' anti-SLAPP motion, and we remand the case with direction to reconsider the anti-SLAPP motion under the proper standards.

1. The defendants in this lawsuit are Wilkes & McHugh, P.A., a Florida-based law firm that focuses on suing nursing homes, and Gary Wimbish, an attorney with the firm who is licensed to practice law in Georgia. On October 11, 2017, the defendants ran a full-page advertisement in a Cobb County newspaper concerning a local nursing home, Bonterra Transitional Care and Rehabilitation ("Bonterra"). On October 12, 2017, they ran a similar ad in a Cobb County newspaper about another local nursing home, Powder Springs Transitional Care and Rehabilitation ("Powder Springs"). And on October 18, 2017, they ran a similar ad in a Rockdale County

newspaper concerning a local nursing home, Rockdale Healthcare Center ("Rockdale Healthcare"), which is owned by LTC Consulting, L.P. Each ad referred to the results of one or more government "surveys," or inspections, of the nursing home named in the ad.[1]

(a) *The Ads*

All three ads had the same format. Each ad stated across the top in a large font and all capital letters, "THIS IS A LEGAL ADVERTISEMENT,"[2] followed by a larger, reverse-background stripe stretching all the way across the page and containing the

---

[1] Federal law requires all nursing homes that participate in Medicare and Medicaid to be surveyed at least once every 15 months, and in Georgia, the Department of Community Health conducts the surveys. See 42 CFR §§ 488.10 (a), 488.308 (a). After a survey of a nursing home, the surveyors send the nursing home an official "Statement of Deficiencies," or SOD, and the nursing home must then submit to the Department a "Plan of Correction," or POC. See 42 CFR § 488.1. In the following weeks or months, the Department conducts a short resurvey to determine whether the cited deficiencies have been corrected. See id. The Department also conducts abbreviated surveys in response to specific complaints. See 42 CFR § 488.308 (f). Federal law requires nursing homes to post at the facility the most recent survey results and a notice of the availability of reports for the preceding three years. See 42 CFR § 483.10 (g) (11). In addition, in 2012, the federal Centers for Medicare and Medicaid Services began posting redacted SODs for nursing homes on the Medicare.gov website.

[2] See Bar Rule 4-102 (d), Georgia Rule of Professional Conduct 7.1 (b) ("A public communication for which a lawyer has given value must be identified as such unless it is apparent from the context that it is such a communication.").

contrasting words "IMPORTANT NOTICE" in a still larger font. This stripe and the stripe described below are the most visually prominent features of the ads.

After the first stripe, the ads stated, in a large, bolded font, "If your loved one has been a resident at," followed by the name of the specified nursing home in an even larger font and in all capital letters. The nursing home's street address appeared on the next line in a much smaller but still bolded font. Aside from the stripes, the nursing home's name was the most prominent feature of each ad. Each ad then stated in a large font: "This facility has been cited for multiple deficiencies* including," followed by three to ten paragraphs of text in a much smaller font that appeared in two columns in the Powder Springs and Bonterra ads and in a single column in the Rockdale Healthcare ad.

Each paragraph of subsequent text began with the word "FAILURE" — bolded, underlined, and in all capital letters — followed by text in regular type in a slightly smaller font that purported to recount the deficiencies for which each nursing home

had been cited in a government survey conducted on one or more dates listed.[3] The text also stated the date by which each deficiency was corrected and described the level of harm from each deficiency and the number of residents affected. After the listing of "FAILURES," the ads contained a densely worded paragraph stretching across the page and preceded by an asterisk — presumably referring back to the word "deficiencies*" above — that, among other things, said that the ads were not authorized or endorsed by any government agency, provided information on the survey process and average numbers of cited deficiencies at nursing homes in Georgia and in the United States, and listed a government website where those interested could find additional information.

Next, the ads contained another large, reverse-background stripe stretching all the way across the page. This stripe stated, in a large font and in all capital letters:

---

[3] The Bonterra ad referred to a survey completed on April 4, 2016. The Powder Springs ad referred to surveys completed on April 23, 2015, September 7, 2016, and January 27, 2017. The Rockdale Healthcare ad referred to a survey completed on October 13, 2016.

POOR CARE AND UNDERSTAFFING CAN LEAD TO: BEDSORES, CHOKING, FALLS, BROKEN BONES, DEHYDRATION, INFECTIONS/SEPSIS, MALNUTRITION, OR UNEXPLAINED DEATH.

Below the stripe, each ad said, in a large, bolded font, "If someone you love has been a resident" of the named nursing home, "we would like to hear your story. Call or email our attorneys for a free consultation." The ads listed a telephone number, email address, and website for the law firm, included the firm's logo underneath, and then stated the law firm's street address in Tampa, Florida. At the end, each ad said in italics: "*Gary Wimbish, Esq. is responsible for the content of this advertisement.*"[4]

(b) *The Trial Court Proceedings*

On October 19, 2017, the owner of Powder Springs filed a Verified Complaint for Ex Parte Temporary Restraining Order and Preliminary and Permanent Injunctive Relief against the

---

[4] See Bar Rule 4-102 (d), Georgia Rule of Professional Conduct 7.2 (c) (1) ("*Disclosure of identity and physical location of attorney.* Any advertisement shall include the name, physical location and telephone number of each lawyer or law firm who paid for the advertisement and who takes full personal responsibility for the advertisement. . . .").

defendants, alleging that the ads violated OCGA § 31-7-3.2's recently enacted subsection (j), which imposes limitations on advertisements that use or reference the results of federal or state surveys or inspections of nursing homes. The complaint also alleged violations of OCGA § 10-1-372 (a) (12), which is part of Georgia's Uniform Deceptive Trade Practices Act, as well as two false advertising statutes, OCGA §§ 10-1-421 (a) (untrue or fraudulent statements in advertisements for goods and services, including professional services) and 10-1-427 (a) (untrue, fraudulent, deceptive, or misleading statements in advertisements for legal services). Attached to the complaint were the ad concerning Powder Springs, one of the three surveys that the ad referenced, and a Scope and Severity Matrix for Nursing Home Deficiencies from the federal Centers for Medicare and Medicaid Services.[5] At the same time, Powder Springs' owner filed a motion for an ex parte temporary restraining order ("TRO").

---

[5] Also attached were the verifications required by a version of OCGA § 9-11-11.1 that was no longer in effect. See former OCGA § 9-11-11.1 (b).

On the morning of October 20, 2017, the trial court granted the TRO. On the same day, Powder Springs' owner filed a First Amended Complaint for Ex Parte Temporary Restraining Order and Preliminary and Permanent Injunctive Relief, adding as plaintiffs the owners of Bonterra and Rockdale Healthcare and attaching as exhibits the defendants' ads concerning Bonterra and Rockdale Healthcare in addition to the ad concerning Powder Springs. The plaintiffs alleged that 91% of nursing homes surveyed are found to have "deficiencies" and that the defendants did not include in the ads all the information required by OCGA § 31-7-3.2 (j). The plaintiffs also alleged that each ad was false, fraudulent, deceptive, and misleading, both because each ad omitted facts necessary to make the ad not materially misleading when considered as a whole, and because each ad falsely implied that residents of the plaintiffs' nursing homes had suffered "BEDSORES," "BROKEN BONES," and "DEATH" from the cited deficiencies. The plaintiffs further alleged, among other things, that the Powder Springs ad falsely stated that four of the deficiencies "constituted minimal harm or the

potential for actual harm," when in reality those four deficiencies were cited at the "D" level, meaning that there was no actual harm.

On the afternoon of October 20, 2017, the plaintiffs filed a motion for an expanded TRO, which the trial court granted. The expanded TRO enjoined the defendants from publishing or causing to be published in any newspaper or other media, including online: "any false, fraudulent, deceptive and misleading advertisements concerning the Plaintiffs"; "the advertisements included as Exhibits A, B, and C to Plaintiffs' [First] Amended Complaint"; and "any advertisements concerning the Plaintiffs that do not fully comply with the requirements of O.C.G.A. § 31-7-3.2 (j)." The expanded TRO was to remain in effect for 30 days or until November 10, 2017, when the court would hold a consolidated hearing on the plaintiffs' requests for preliminary and permanent injunctive relief.

On the day before the injunction hearing, the defendants filed a Motion to Dismiss or to Strike Pursuant to OCGA §§ 9-11-11.1 and 9-11-12 (b) (6), attaching as exhibits printouts from the Medicare.gov website concerning the surveys that the defendants

cited in their ads. The defendants argued among other things that OCGA § 31-7-3.2 (j) violates the First Amendment and, in any event, that the ads substantially complied with the statute. At the hearing on November 10, 2017, the defendants contended that the trial court was required to hear their motion first, and the trial court did so. After the parties completed their arguments on the defendants' motion, the court took a brief recess before announcing that it would enter an order denying the defendants' motion. The court then adjourned the hearing to give the defendants' attorneys an opportunity to consult with their clients about taking an immediate appeal of the ruling on the motion. The defendants filed verified answers to the complaint later that month.

On November 30, 2017, the trial court entered an order denying the defendants' motion to strike. The court ruled that, even if the plaintiffs' claims arose from acts by the defendants that could reasonably be construed as in furtherance of their rights of petition or free speech in connection with an issue of public concern, the plaintiffs had established that there was a probability that they

would prevail on their claims, thereby barring dismissal. The defendants then filed a timely notice of appeal directed to the Court of Appeals.

(c) *The Appeal*

After briefing and oral argument, the Court of Appeals on August 27, 2018, properly transferred the case to this Court based on the plaintiffs' First Amendment challenge to OCGA § 31-7-3.2 (j), which the trial court implicitly rejected in denying the defendants' motion.[6] On October 2, 2018, the plaintiffs filed a motion to return the case to the Court of Appeals, which this Court denied on October 22, 2018. The parties then filed supplemental briefs addressing certain First Amendment issues, but only as to OCGA § 31-7-3.2 (j). The case was orally argued in this Court on January 22, 2019.

---

[6] See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1) ("The Supreme Court . . . shall exercise exclusive appellate jurisdiction in . . . all cases in which the constitutionality of a law . . . has been drawn in question[.]"). See also *Rouse v. Dept. of Natural Resources*, 271 Ga. 726, 728 (524 SE2d 455) (1999) (finding jurisdiction in this Court despite lack of explicit trial court ruling on constitutional challenges to statute where "the trial court must necessarily have rejected each of those issues to affirm the administrative decision").

2. "Strategic lawsuits against public participation," or "SLAPPs,"[7] are meritless lawsuits brought not to vindicate legally cognizable rights, but instead to deter or punish the exercise of constitutional rights of petition and free speech by tying up their target's resources and driving up the costs of litigation. To combat this practice, in 1996, the General Assembly added an anti-SLAPP provision to the Civil Practice Act, OCGA § 9-11-11.1. See Ga. L. 1996, p. 260, § 1 (codified as amended at OCGA § 9-11-11.1). In 2016, the General Assembly revised OCGA § 9-11-11.1 to substantially track California's anti-SLAPP procedure as set out in California Code of Civil Procedure § 425.16. See Ga. L. 2016, p. 341, § 2.

We have construed Georgia's anti-SLAPP statute a handful of times over the years since it was first enacted in 1996. See, e.g., *EarthResources, LLC v. Morgan County*, 281 Ga. 396 (638 SE2d 325) (2006); *Denton v. Browns Mill Dev. Co.*, 275 Ga. 2 (561 SE2d 431)

---

[7] Both terms were coined by professors at the University of Denver. See Penelope Canan & George W. Pring, "Studying Strategic Lawsuits against Public Participation: Mixing Quantitative and Qualitative Approaches," 22 Law & Society Rev. 385 (1988).

(2002). For the most part, these cases have construed provisions of the anti-SLAPP statute that the 2016 amendment removed, see, e.g., *Atlanta Humane Society v. Harkins*, 278 Ga. 451, 452-454 (603 SE2d 289) (2004) (construing verification provisions of former OCGA § 9-11-11.1 (b)), or they have interpreted language in the anti-SLAPP statute the meaning of which the 2016 amendment substantially changed, see, e.g., *Berryhill v. Ga. Community Support & Solutions, Inc.*, 281 Ga. 439, 439-443 (638 SE2d 278) (2006) (interpreting language in former OCGA § 9-11-11.1 (b) retained in the current anti-SLAPP statute, but based on the two-part definition provided in former OCGA § 9-11-11.1 (c), which has now been expanded into a four-part definition); *Denton*, 275 Ga. at 4-7 (same). See also *Neff v. McGee*, 346 Ga. App. 522, 524 n.2 (816 SE2d 486) (2018) (noting that the 2016 amendment to OCGA § 9-11-11.1 expanded the scope of the anti-SLAPP statute); *Rosser v. Clyatt*, 348 Ga. App. 40, 42 (821 SE2d 140) (2018) (same). Moreover, the 2016 amendment fundamentally altered the mechanics of the anti-SLAPP procedure. Thus, our precedents construing the pre-

amendment version of OCGA § 9-11-11.1 are of limited utility in interpreting the revised anti-SLAPP statute.

The California Supreme Court, by contrast, has developed a considerable body of case law interpreting the text of California Code of Civil Procedure § 425.16, which, as explained below, is very similar to the text of Georgia's revised anti-SLAPP statute. Thus, in interpreting our new OCGA § 9-11-11.1, we may look to California case law interpreting § 425.16 for guidance, especially decisions — such as the ones cited in this opinion — that employ the same kind of statutory analysis that we generally use. Cf., e.g., *Chappuis v. Ortho Sport & Spine Physicians Savannah, LLC*, 305 Ga. 401, 404 & n.4 (825 SE2d 206) (2019) (looking to Federal Rule of Civil Procedure 12 (f) and the federal decisions thereunder "to aid us in determining the purpose and meaning of" a provision of the Civil Practice Act modeled on the federal rule (citation and punctuation omitted)); *Zaldivar v. Prickett*, 297 Ga. 589, 598-600 (774 SE2d 688) (2015) (looking to decisions in other jurisdictions with similar apportionment statutes in interpreting Georgia's apportionment

statute, including California, Colorado, Florida, Kansas, Michigan, New Hampshire, and Wyoming).[8]

(a) *Georgia's Newly Revised Anti-SLAPP Statute*

OCGA § 9-11-11.1 (a) declares that "it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech," and that "the valid exercise of the constitutional rights of petition and freedom of speech should not be chilled through abuse of the judicial process." Subsection (a) also provides that OCGA § 9-11-11.1 "shall be construed broadly" to accomplish these declarations. Accord Cal. Code Civ. Proc. § 425.16 (a) (same). The rest of OCGA § 9-11-11.1 concerns anti-SLAPP motions to strike a claim or to dismiss a complaint, which are usually, but not necessarily, filed by defendants against plaintiffs, as is the case here. Thus, the "moving party" is usually the defendant, and the "nonmoving party" is

---

[8] OCGA § 9-11-11.1 and California Code of Civil Procedure § 425.16 are not identical in every respect, however, and where the language of the two statutes differs in substance, the California case law may not be instructive.

usually the plaintiff.

Subsection (b), which is now divided into three paragraphs, substantially changes the procedural mechanism from former OCGA § 9-11-11.1 for challenging SLAPPs at the outset of litigation.[9] The first paragraph provides:

> A claim for relief against a person or entity arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the

[9] Former OCGA § 9-11-11.1 (b) provided that for any claim asserted against a person or entity arising from an act that could reasonably be construed as an act in furtherance of constitutional rights of free speech or petition, both the party asserting the claim and the party's attorney had to file with the pleading containing the claim a written verification under oath certifying: that they had read the claim; that to the best of their knowledge, information, and belief formed after reasonable inquiry, the claim was well grounded in fact and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; that the act forming the basis for the claim was not privileged under OCGA § 51-5-7 (4); and that the claim was not interposed for any improper purpose, such as to suppress a person's or entity's rights of free speech or petition, to harass, or to cause unnecessary delay or needless increase in the cost of litigation. The court was required to strike any claim not verified as required by the statute unless the party asserting the claim verified it within ten days after the omission was called to the party's attention. Former OCGA § 9-11-11.1 (b) provided that if a claim was verified in violation of the statute, "the court, upon motion or upon its own initiative, shall impose upon the persons who signed the verification, a represented party, or both an appropriate sanction which may include dismissal of the claim" and an order to pay the other party or parties their reasonable expenses incurred from the filing of the pleading, including attorney fees.

Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern shall be subject to a motion to strike unless the court determines that the nonmoving party has established that there is a probability that the nonmoving party will prevail on the claim.

OCGA § 9-11-11.1 (b) (1). Accord Cal. Code Civ. Proc. § 425.16 (b) (1) (similar). The second paragraph provides: "In making the determination as provided for in paragraph (1) of this subsection, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based. . . ." OCGA § 9-11-11.1 (b) (2).[10] Accord Cal. Code Civ. Proc. § 425.16 (b) (2) (similar).

The third paragraph of subsection (b) addresses later proceedings in the same case and in any subsequent case. It provides that a determination that the nonmoving party (usually, the plaintiff) would prevail on a claim or the fact that such a

---

[10] The second paragraph of OCGA § 9-11-11.1 (b) further provides that if there is a claim that the nonmoving party is a public figure plaintiff, then the nonmoving party is entitled to discovery on the sole issue of actual malice if actual malice is relevant to the court's determination under the first paragraph. This language does not appear in California's anti-SLAPP statute.

determination was made is not admissible in evidence in any later stage of the case or in any subsequent proceeding, and that such a determination does not affect the burden or degree of proof otherwise applicable in any later stage of the case or in any subsequent proceeding. See OCGA § 9-11-11.1 (b) (3). Accord Cal. Code Civ. Proc. § 425.16 (b) (3) (similar). A new subsection, OCGA § 9-11-11.1 (b.1), requires the trial court to award "attorney's fees and expenses of litigation related to the action" to a moving party (usually, the defendant) who prevails on an anti-SLAPP motion, and to award "attorney's fees and expenses of litigation associated with the motion" to a nonmoving party (usually, the plaintiff) who prevails on an anti-SLAPP motion if the court finds that the motion was frivolous or solely intended to cause unnecessary delay. Accord Cal. Code Civ. Proc. § 425.16 (c) (1) (similar).

The General Assembly also substantially expanded the scope of the anti-SLAPP statute by adding paragraphs (3) and (4) at the end of subsection (c). This subsection, as revised, provides:

As used in this Code section, the term "act in

furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" shall include:

> (1) Any written or oral statement or writing or petition made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;
>
> (2) Any written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;
>
> (3) Any written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern; or
>
> (4) Any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern.

OCGA § 9-11-11.1 (c) (1)-(4). Accord Cal. Code Civ. Proc. § 425.16 (e) (1)-(4) (similar).

The General Assembly left subsection (d) largely unchanged. It provides:

> All discovery and any pending hearings or motions in the action shall be stayed upon the filing of a motion to dismiss or a motion to strike made pursuant to subsection (b) of this Code section until a final decision on the motion. The motion shall be heard not more than 30 days after

service unless the emergency matters before the court require a later hearing. The court, on noticed motion and for good cause shown, may order that specified discovery or other hearings or motions be conducted notwithstanding this subsection.

OCGA § 9-11-11.1 (d). Accord Cal. Code Civ. Proc. § 425.16 (f), (g) (similar).[11] But in a significant departure from prior practice, the 2016 revision added a new subsection (e), which authorizes an immediate appeal as of right from "[a]n order granting or denying" an anti-SLAPP motion. OCGA § 9-11-11.1 (e).[12] See *Grogan v. City of Dawsonville*, 305 Ga. 79, 83-84 (823 SE2d 763) (2019). Accord Cal. Code Civ. Proc. § 425.16 (i) (similar). The remaining subsections of OCGA § 9-11-11.1 are not relevant to this appeal.[13]

---

[11] The only change to this subsection from the pre-2016 version is the addition at the end of the first sentence of the words "until a final decision on the motion."

[12] The General Assembly amended the Appellate Practice Act at the same time to reflect this change. See OCGA § 5-6-34 (a) (13) (authorizing appeals from "[a]ll judgments or orders entered pursuant to Code Section 9-11-11.1"). Accord Cal. Code Civ. Proc. § 904.1 (a) (13) (similar).

[13] Subsection (f) contains the same language as former OCGA § 9-11-11.1 (e): "Nothing in this Code section shall affect or preclude the right of any party to any recovery otherwise authorized by common law, statute, law, or rule." OCGA § 9-11-11.1 (f). This language does not appear in California's anti-SLAPP statute. Subsection (g), which is new, provides: "This Code section shall not apply to any action brought by the Attorney General or a prosecuting

(b) *Georgia's New Anti-SLAPP Procedure*

The text of OCGA § 9-11-11.1 (b) (1) makes clear that the analysis of an anti-SLAPP motion involves two steps.[14] First, the court must decide whether the party filing the anti-SLAPP motion (usually, the defendant) has made a threshold showing that the challenged claim is one "arising from" protected activity. OCGA § 9-11-11.1 (b) (1). See *Navellier v. Sletten*, 52 P3d 703, 708 (Cal. 2002). It is not enough to show that the claim was filed "after protected activity took place" or "arguably may have been 'triggered' by protected activity." Id. at 708-709 (quoting *City of Cotati v. Cashman*, 52 P3d 695, 701 (Cal. 2002)). "[T]he critical consideration

---

attorney, or a city attorney acting as a prosecutor, to enforce laws aimed at public protection." OCGA § 9-11-11.1 (g). Accord Cal. Code Civ. Proc. § 425.16 (d) (similar). Finally, subsection (h) of the revised statute, which largely retains the language of former OCGA § 9-11-11.1 (f), provides: "Attorney's fees and expenses of litigation under this Code section shall be requested by motion at any time during the course of the action but not later than 45 days after the final disposition, including but not limited to dismissal by the plaintiff, of the action." The only changes are the addition of the words "of litigation" after the word "expenses" and substitution of the word "shall" for the word "may" in the phrase "shall be requested." The language of OCGA § 9-11-11.1 (h) does not appear in California's anti-SLAPP statute.

[14] As noted above, in performing this analysis, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based. . . ." OCGA § 9-11-11.1 (b) (2).

is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." Id. at 709 (emphasis in original). A defendant meets its burden by demonstrating that the act underlying the challenged claim "could reasonably be construed as" fitting within one of the categories spelled out in subsection (c). OCGA § 9-11-11.1 (b) (1). See OCGA § 9-11-11.1 (c) (1)-(4); *Navellier*, 52 P3d at 708.

If a court concludes that this threshold showing has been made, it must proceed to the second step of the analysis and decide whether the plaintiff "has established that there is a probability that the [plaintiff] will prevail on the claim." OCGA § 9-11-11.1 (b) (1). To meet this burden, "the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Soukup v. Law Offices of Herbert Hafif*, 139 P3d 30, 51 (Cal. 2006) (citation and punctuation omitted). See *Taus v. Loftus*, 151 P3d 1185, 1205 (Cal. 2007) ("[P]ast cases interpreting [California Code of Civil Procedure

§ 425.16] establish that the Legislature did not intend that a court, in ruling on a motion to strike under this statute, would weigh conflicting evidence to determine whether it is more probable than not that [the] plaintiff will prevail on the claim."); *Briggs v. Eden Council for Hope & Opportunity*, 969 P2d 564, 575 (Cal. 1999) (explaining that the second step "requir[es] the court to determine only if the plaintiff has stated and substantiated a legally sufficient claim" (citation and punctuation omitted)). See also *RCO Legal, P.S., Inc. v. Johnson*, 347 Ga. App. 661, 667 n.10 (820 SE2d 491) (2018) (holding, in case decided under current version of Georgia's anti-SLAPP statute, that "'[t]o satisfy the second prong, a plaintiff responding to an anti-SLAPP motion must state and substantiate a legally sufficient claim'" (quoting *Oasis West Realty, LLC v. Goldman*, 250 P3d 1115, 1120 (Cal. 2011))). "The plaintiff's evidence is accepted as true; the defendant's evidence is evaluated to determine if it defeats the plaintiff's showing as a matter of law." *City of Montebello v. Vasquez*, 376 P3d 624, 631 (Cal. 2016).

Only a claim that satisfies "*both* prongs of the anti-SLAPP statute — i.e., that arises from protected [activity] *and* lacks even minimal merit — is a SLAPP" that is subject to being stricken. *Navellier*, 52 P3d at 708 (emphasis in original). See *City of Montebello*, 376 P3d at 631 ("The procedure is meant to prevent abusive SLAPP suits, while allowing claims with the requisite minimal merit to proceed." (citation and punctuation omitted)). Appellate review of an order granting or denying an anti-SLAPP motion is de novo. See *RCO Legal*, 347 Ga. App. at 661. See also *Soukup*, 139 P3d at 36 n.3.

3. As explained above, the first step of the anti-SLAPP analysis is to decide whether the party or parties filing the anti-SLAPP motion — here, the defendants — made a threshold showing that the plaintiffs' claims are ones "arising from" protected activity. OCGA § 9-11-11.1 (b) (1). See *Navellier*, 52 P3d at 709. Contrary to the plaintiffs' representations to this Court, the trial court did not decide that issue in the order under review here. Instead, the trial court assumed without deciding that the anti-SLAPP statute

applied and rejected the defendants' anti-SLAPP motion at the second step of the analysis. In any event, we agree with the defendants that they met their burden to make a threshold showing that the plaintiffs' claims are ones arising from protected activity by demonstrating that the acts underlying the claims "could reasonably be construed as" fitting within at least one of the four categories spelled out in subsection (c). OCGA § 9-11-11.1 (b) (1). See *Navellier*, 52 P3d at 709.

OCGA § 9-11-11.1 (c) (4) refers to "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern." The plaintiffs' claims that the defendants violated OCGA § 31-7-3.2 (j), the Uniform Deceptive Trade Practices Act ("UDTPA"), and the false advertising statutes are all based on the defendants' running of ads in local newspapers informing the public of the defendants' availability to provide legal services related to alleged serious injuries and even deaths at nursing homes in the area that resulted from deficiencies cited in government surveys. It is "well

established that lawyer advertising is commercial speech and, as such, is accorded a measure of First Amendment protection." *Florida Bar v. Went For It, Inc.*, 515 U. S. 618, 623 (115 SCt 2371, 132 LE2d 541) (1995). And the alleged existence of serious injuries and deaths at local nursing homes resulting from deficiencies known to a government agency certainly qualifies as a public issue or an issue of public concern. See generally *FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P3d 1156 (Cal. 2019) (discussing analogous catchall provision of California's anti-SLAPP statute). Thus, running the ads could reasonably be construed as an act in furtherance of the defendants' constitutional right of free speech in connection with a public issue or an issue of public concern, see OCGA § 9-11-11.1 (c) (4), and the defendants therefore met their burden of making a threshold showing that the plaintiffs' claims are ones arising from protected activity.[15]

---

[15] Given our conclusion that the defendants met their burden to make a threshold showing that the acts underlying the plaintiffs' claims could reasonably be construed as fitting within the category described in OCGA § 9-11-11.1 (c) (4), we need not address whether the defendants' running of the ads

4. The second step of the anti-SLAPP analysis requires a determination of whether the party or parties opposing the anti-SLAPP motion — here, the plaintiffs — have established that there is a probability that they will prevail on their claims that the defendants violated OCGA § 31-7-3.2 (j), the UDTPA, and the false advertising statutes. See OCGA § 9-11-11.1 (b) (1). To meet this burden, the plaintiffs were required to demonstrate that their claims are both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if their evidence is credited. See *Soukup*, 139 P3d at 51; *Briggs*, 969 P2d at 574-575. In deciding whether the plaintiffs met their burden, the plaintiffs' evidence as to each claim is accepted as true, and the defendants' evidence is evaluated only to determine if it defeats the plaintiffs' showing as a matter of law. See *City of Montebello*, 376 P3d at 631.

As noted above, the trial court concluded that the plaintiffs met

could reasonably be construed as fitting within any of the other categories spelled out in the anti-SLAPP statute. See OCGA § 9-11-11.1 (c) (1)-(3).

their burden at the second step of the anti-SLAPP analysis and therefore denied the defendants' anti-SLAPP motion. The court quoted the relevant part of OCGA § 9-11-11.1 (b) (1) and then explained its reasoning only as follows:

> Here, Plaintiffs have demonstrated a probability of prevailing on their claim[s]. Plaintiffs have made this showing by submitting a verified complaint citing to the Georgia statute limiting the use of survey data and by prevailing on their temporary restraining order on the same issue before this Court.

It is not entirely clear what the court meant by this passage, and a review of the transcript of the hearing on the anti-SLAPP motion does not add clarity.

What is clear, however, is that the trial court did not properly apply the required step two analysis under OCGA § 9-11-11.1 with respect to the plaintiffs' claims. There was no discussion or analysis of whether the plaintiffs had "stated and substantiated a legally sufficient claim" for violations of the cited statutes. *Briggs*, 969 P2d at 575. See *Soukup*, 139 P3d at 51 (holding that the question is whether "the complaint is both legally sufficient and supported by a

sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited" (citation and punctuation omitted)). Moreover, neither the trial court nor the parties have addressed certain important preliminary questions.

The first such question is whether the statutes cited in the complaint apply here at all. For example, OCGA § 31-7-3.2 (j) appears in Article 1 of Chapter 7 of Title 31 of the Georgia Code, which establishes Georgia's regulatory framework for hospitals and related institutions, including nursing homes, which seems an unlikely place to find a statute regulating attorney advertising. See *City of Guyton v. Barrow*, 305 Ga. 799, 805 (828 SE2d 366) (2019) ("The primary determinant of a text's meaning is its context, which includes the structure and history of the text and the broader context in which that text was enacted . . . ."). And the text of OCGA § 10-1-427 appears to contemplate enforcement, at least initially, by the Attorney General, not by private parties.

If the most natural reading of the statutory text is that the cited statutes do apply to the defendants' ads, there is a constitutional separation of powers issue that might require reading them not to apply, see *State of Ga. ex rel. Doyle v. Frederick J. Hanna & Assocs., P.C.*, 287 Ga. 289, 290-294 (695 SE2d 612) (2010), or that might prevent them from applying, see *GRECCA, Inc. v. Omni Title Svcs., Inc.*, 277 Ga. 312, 312-313 (588 SE2d 709) (2003). There is also a significant First Amendment issue with respect to the application of each statute here, which the parties only tangentially addressed in the trial court and have not adequately addressed in their briefs on appeal.

In short, the trial court did not apply the proper standards at step two of the anti-SLAPP analysis, and the particular claims at issue in this case implicate complex and important questions of statutory interpretation and constitutional law. We should not address these claims in the first instance on appeal. Accordingly, we vacate the trial court's denial of the defendants' anti-SLAPP motion, and we remand the case to the trial court with direction to

reconsider the motion under the analysis set out above. See, e.g., *Gramiak v. Beasley*, 304 Ga. 512, 522-523 (820 SE2d 50) (2018); *Clayton County v. City of College Park*, 301 Ga. 653, 656-657 (803 SE2d 63) (2017); *Southern LNG, Inc. v. MacGinnitie*, 294 Ga. 657, 667-669 (755 SE2d 683) (2014).

*Judgment vacated and case remanded with direction. All the Justices concur, except Bethel, J., not participating.*

Decided June 24, 2019.
Anti-SLAPP statute. Cobb Superior Court. Before Judge Flournoy.
*S. Leighton Moore III, Meredith S. Watts*, for appellants.
*Arnall Golden Gregory, Jason E. Bring, Kara G. Silverman*, for appellees.