**FOURTH DIVISION**
**RICKMAN, C. J.,**
**DILLARD, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 12, 2023**

# In the Court of Appeals of Georgia

A23A0464. MORGAN v. MAINSTREET NEWSPAPERS, INC.

PIPKIN, Judge.

Appellant Scott Morgan, a city councilman for the City of Bethlehem,[1] sued Appellee Mainstreet Newspapers asserting a claim of libel per se.[2] This action stems from an article appearing in the Barrow News-Journal ("BNJ") -- a newspaper operated by Mainstreet Newspapers -- concerning Morgan and his neighbors, the Johnsons. On Mainstreet's motion, the trial court dismissed the action pursuant to

---

[1] Though the parties refer to Bethlehem as a "City," the record suggests that Bethlehem is officially recognized as a "Town." For convenience, we have used the nomenclature utilized by the parties.

[2] Morgan later amended his complaint to include a claim of invasion of privacy, but that claim was not addressed by the current order. Despite the remaining claim, this appeal is proper pursuant to OCGA § 5-6-34 (a) (13).

Georgia's anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP") statute, OCGA § 9-11-11.1, and Morgan now appeals. For the reasons that follow, we affirm.

1. While we review the pleadings and relevant materials in a light most favorable to Morgan, see *ACLU v. Zeh*, 312 Ga. 647, 652-653 (1) (c) (864 SE2d 422) (2021), the facts and circumstances underlying this action are not particularly controverted.

Sometime in late 2021, Morgan filed a complaint with the City of Bethlehem alleging that his neighbors, the Johnsons, were violating the Uniform Development Code; the issue was reviewed by the city's attorney. At a February 2022 meeting of the Bethlehem City Council ("BCC"), the council discussed the alleged code violations on the Johnsons' property and voted to have the city attorney send a letter to the Johnsons concerning the alleged violations; Morgan voted in favor of this decision.[3] Consistent with this vote, a "Notice of Violation of the Bethlehem Code of Ordinances" was sent to the Johnsons describing the alleged violations, namely, "a trailer with an expired tag loaded with construction materials located on the property," "various pieces of equipment stored outdoors on the property,"

---

[3] In addition to being a councilman, Morgan is also the Director of Zoning and Planning for the City of Cumming.

"construction material located outdoors on the property," as well as "what appear[ed] to be refuse and trash." The Johnsons subsequently appeared at the March 2022 meeting of the BCC, and, according to Morgan, "personally attacked Morgan in a written and oral response."[4] The council, with Morgan abstaining, voted to "table" the code enforcement pending discussions about "code interpretation."

For reasons that are not immediately clear in the record, Morgan reached out to Mainstreet News to have a reporter attend the April 2022 BCC meeting. Both the Johnsons and a reporter with the BNJ attended the April 2022 meeting, which, according to Morgan, began with him "respond[ing] to the Johnson[s'] personal and defamatory attacks" by "read[ing] a prepared statement to the Council." After discussing the Johnsons' alleged code violations, the BCC voted -- with Morgan abstaining -- to "dismiss the issue permanently." In the days following the meeting, the BNJ reporter reached out to Morgan to discuss the council's decision concerning the Johnsons' alleged code violations. In his written response, Morgan questioned

[4] A copy of the Johnsons' prepared statement that was presented at the March 2022 BCC meeting is included in the record. In their statement, the Johnsons recount their on-going dispute with Morgan; the Johnsons also rebut the allegations of the code violations, noting that the city's letter seemingly relied on incorrect sections of the UDC and was based on inaccurate information. Finally, the Johnsons name and quote a code enforcement officer who, they say, reviewed the letter and, apparently, did not share the city attorney's interpretation of the code.

why the council had not followed the recommendation of the city attorney to issue citations, and Morgan maintained that the Johnsons were violating the code. Morgan -- who described himself as "an elected official . . . represent[ing] all people of Bethlehem, including our family" -- mentioned that he was "surprised and disappointed" with the decision to dismiss the alleged code infractions and complained that the Johnsons had "junked up" areas of their property close to the property line.

Days later, the BNJ published a front-page article entitled, "Bethlehem councilman's protests against neighbors backfires."[5] The short article begins by telling readers that "Morgan opened Bethlehem's April meeting by airing his grievances about his neighbors." The writing then recounts the BCC's consideration of the alleged violations, and the piece explains that the council eventually voted to permanently dismiss the matter. The article also quotes part of the statement made by the Johnsons at the March 2022 BCC meeting, including an allegation by the Johnsons that they were being "harassed by Scott Morgan." The news piece concludes by touching on the details of the years-long dispute between the neighbors, which includes a quarrel involving the Johnsons' animals. Specifically, the article

_____

[5] The article was published in print and online.

4

explains that Morgan reported the animals to the BCC as a nuisance, and, according to the Johnsons, he complained to the animal shelter about their dogs; the Johnsons also told the reporter about the "'mysterious death' of their female goat after one of [their] cows was shot in late December 2021."

Just days later, Morgan filed suit against Mainstreet alleging libel per se. In his complaint, Morgan asserted that the article falsely claimed that: "Bethlehem councilman's (Morgan) protests against neighbors backfires"; "Morgan in his capacity as an individual citizen is acting as a Bethlehem City Councilman"; "Morgan opened Bethlehem's April meeting by airing his grievances about his neighbors"; "[the] Johnsons['] 'Grand Pyranese' dogs and goats are a source of contention with the councilman"; "that Morgan is violating the Bethlehem code himself"; and "implies to the average reader that Morgan killed the Johnsons' goat and cow."

After answering, Mainstreet moved to dismiss the complaint, arguing that the publication was protected under OCGA § 9-11-11.1; that it was privileged under OCGA § 51-5-7; that Morgan, a public official, could not recover because there was no actual malice; that the publication expressed opinion, which is not defamatory; and, finally, that all of the alleged defamatory statements are substantially true or

5

opinion.[6] In response,[7] Morgan countered that the publication concerned nothing more than a dispute between neighbors; he asserted that he was neither a public figure nor a limited-purpose public figure and that "[t]here is no privilege for publication of private malice." In a detailed order, the trial court granted Mainstreet's motion to dismiss, first determining that the publication fell within the protection afforded by the anti-SLAPP statute and then concluding that there was no probability Morgan would prevail in his action. The trial court noted that Morgan was a public official and had pointed to no evidence of malice; the trial court also concluded that the statements about which Morgan complained were either opinion, truthful, or non-defamatory. Morgan now appeals.

---

[6] Mainstreet attached numerous exhibits to its motion to dismiss, including the letter from the city to the Johnsons, the Johnsons' statement to the BCC at the March 2022 hearing, meeting agendas and minutes from various BCC meetings, the email from Morgan inviting a Mainstreet reporter to the April 2022 meeting, emails between the BNJ reporter and Morgan after the April 2022 BCC meeting, and an affidavit from the reporter who wrote the article. Aside from one averment included in the affidavit about the BCC investigating a possible UDC violation by Morgan -- which Morgan calls a "bold face lie" -- Morgan has conspicuously never challenged the validity or veracity of any of these exhibits, including the reporter's affidavit.

[7] In his response, Morgan does not refer to the Johnsons by name; instead, he refers to them as the "[Code] Violating Neighbor."

2. "[T]he First Amendment to the United States Constitution places substantial limitations on state defamation law." *ACLU v. Zeh*, 312 Ga. at 648 (1). To this end, Georgia's anti-SLAPP statute aims to "encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech," OCGA § 9-11-11.1 (a), and to quell "meritless lawsuits brought not to vindicate legally cognizable rights, but instead to deter or punish the exercise of constitutional rights of petition and free speech by tying up their target's resources and driving up the costs of litigation," *Geer v. Phoebe Putney Health System, Inc.*, 310 Ga. 279, 282 (2) (849 SE2d 660) (2020). Without question, "[s]peech on matters of public concern is at the heart of the First Amendment's protection." (Citation and punctuation omitted.) *Snyder v. Phelps*, 562 U.S. 443, 451-452 (II) (131 SCt 1207, 179 LE2d 172) (2011).

Our analysis begins with the plain language of Georgia's anti-SLAPP statute, which states as follows:

> A claim for relief against a person or entity arising from any act of such person or entity which *could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern* shall be subject to a motion to strike unless the court determines

7

that the nonmoving party has established that there is a probability that the nonmoving party will prevail on the claim.

(Emphasis supplied.) OCGA § 9-11-11.1 (b) (1). Subsection (c) of OCGA § 9-11-11.1 provides that the phrase "'act in furtherance of the person's or entity's right of petition or free speech . . . in connection with an issue of public interest or concern'" includes the following:

>    (1) Any written or oral statement or writing or petition made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;

>    (2) Any written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;

>    (3) Any written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern; or

>    (4) Any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern.

OCGA § 9-11-11.1 (c) (1), (2), and (3). According to the plain language of the statute,

>    the analysis of an anti-SLAPP motion to strike [or dismiss] involves two steps. First, the court must decide whether the party filing the anti-SLAPP motion (here, [Mainstreet]) has made a threshold showing

8

that the challenged claim is one "arising from" protected activity. If so, the court must decide whether the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

(Citations and punctuation omitted.) *ACLU v. Zeh*, 312 Ga. at 650 (1) (a). Regarding this first inquiry,

[t]he critical consideration is whether the cause of action is based on the defendant's protected free speech or petitioning activity. A defendant meets its burden by demonstrating that the act underlying the challenged claim 'could reasonably be construed as' fitting within one of the categories spelled out in [OCGA § 9-11-11.1 (c)].

(Citation, punctuation, and emphasis omitted.) *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 262 (2) (b) (830 SE2d 119) (2019). Turning to the second step, establishing a probability of success on the merits,

the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. The plaintiff's evidence is accepted as true; the defendant's evidence is evaluated to determine if it defeats the plaintiff's showing as a matter of law.

(Citations and punctuation omitted.) Id.

"Only a claim that satisfies both prongs of the anti-SLAPP statute – i.e., that arises from protected activity and lacks even minimal merit – is a SLAPP that is subject to being stricken." (Citation, punctuation, and emphasis omitted.) Id. at 262-

9

263 (2) (b). We review the trial court's decision de novo. *ACLU v. Zeh*, 312 Ga. at 652 (1) (c).

(a) "As explained above, the first step of the anti-SLAPP analysis is to decide whether the party or parties filing the anti-SLAPP motion -- here, [Mainstreet] --made a threshold showing that [Morgan's] claims are ones 'arising from' protected activity." *Wilkes & McHugh*, 306 Ga. at 263 (3). There can be little doubt that the newspaper article at issue here arises from protected First Amendment activity. See OCGA § 9-11-11.1.

As an initial matter, the trial court concluded, among other things, that the relevant article concerned "issues under consideration by a legislative body" under OCGA § 9-11-11.1 (c) (2), a conclusion that Morgan does not squarely challenge.[8] Nevertheless, we see no error in the trial court's decision.

---

[8] Morgan flatly contends -- without the benefit of supporting authority -- that Georgia's anti-SLAPP statute "only protects statements [made] in connection with an issue of public interest or concern." According to Morgan, the trial court's ruling is erroneous because, he says, his private dispute with the Johnsons is not a matter of public issue or concern and because, he says, the dispute is unrelated to his official position or conduct. This position, however, misapprehends the anti-SLAPP statute. While OCGA § 9-11-11.1 is broadly concerned with protecting the exercise of free speech "in connection with an issue of public interest or concern," the statute *also* expressly identifies four circumstances in which that standard is satisfied, see OCGA § 9-11-11.1 (c) (1-4), a standard that the trial court highlighted and applied. Morgan's brief does not address this portion of the anti-SLAPP statute.

10

Here, the record establishes without contradiction that Morgan's disputes with the Johnsons -- including with their animals and the state of their property -- were referred to and considered by BCC. Indeed, the relevant agendas and meeting minutes show that the council considered the code-violation dispute at *multiple* meetings and heard prepared statements from *both parties*. While the BNJ's article may have contextualized the on-going dispute between Morgan and his neighbors, such an angle does not negate the fact that it undoubtedly originated from and concerned the numerous proceedings before the BCC, a legislative body.[9] See *Lovett v. Capital Principles, LLC*, 300 Ga. App. 799, 801-802 (686 SE2d 411) (2009) (communications by third-party technology vendor critical of Fulton County School employee and department subject to anti-SLAPP protections because vendor's statements were made in connection with the school board's consideration of the implementation of the vendor's software). Compare *Georgia Community Support & Solutions, Inc. v. Berryhill*, 275 Ga. App. 189, 192 (1) (620 SE2d 178) (2005) (anti-SLAPP statute did not apply where there was no evidence that any official proceeding was ever involved, "either before or after [the defendant's] statements").

---

[9] See, e.g., *Brown v. City of East Point*, 246 Ga. 144, 144 (268 SE2d 912) (1980) (recognizing that municipal councils act as legislative bodies).

11

Alternatively, given that, by Morgan's own words, the matters discussed in the article concerned both zoning and code violations -- as well as alleged nuisance -- and were considered by both the city attorney and the BCC for months, we also agree with the trial court that this article is connected with a public issue and/or an issue of public concern pursuant to OCGA § 9-11-11.1 (c) (4). See *Settles Bridge Farm, LLC v. Masino*, 318 Ga. App. 576, 579 (3) (734 SE2d 456) (2012) (communications concerning zoning decisions "constituted statements made in connection with an issue of public interest or concern"); *Providence Constr. Co. v. Bauer*, 229 Ga. App. 679, 680 (1) (494 SE2d 527) (1997) (letters to county officials concerning development covered by anti-SLAPP).

Accordingly, we agree with the trial court that Mainstreet made a showing that the speech underlying Morgan's cause of action could reasonably be construed as conduct fitting within one of the categories spelled out in OCGA § 9-11-11.1 (c).

(b) Turning now to the second step of the anti-SLAPP analysis, we must consider whether Morgan has demonstrated that his "complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." (Citation and punctuation omitted.) *Wilkes & McHugh*, 306 Ga. at 262 (2) (b). This step

requires this Court to accept the evidence from the non-moving party as true and look to the evidence from the moving party "to determine if it defeats the [non-movant's] showing as a matter of law." (Citations and punctuation omitted.) Id.

As an initial matter, Morgan's brief does not address this second step of the anti-SLAPP analysis. Instead, in a one-paragraph argument, he makes two claims. He first contends that "the trial court's order does not follow or address the required two-step analysis." However, the trial court's detailed and considered order -- which spans 10 pages -- undisputedly engages in the second step of the anti-SLAPP analysis, specifically addressing the probability of Morgan prevailing on his claims. Morgan then argues that the second prong of the anti-SLAPP analysis is unnecessary because, he says, the BNJ article does not fall within the protections of the anti-SLAPP statute; however, as discussed above, we have already resolved that question against

13

Morgan.[10] Despite the limited scope of Morgan's enumeration, we briefly review the

trial court's conclusion that Morgan cannot overcome this second step in the anti-

SLAPP analysis.

In his complaint, Morgan asserted a claim of libel per se against Mainstreet,

which generally "consists of a charge that one is guilty of a crime, dishonesty or

immorality." *Zarach v. Atlanta Claims Assn.*, 231 Ga. App. 685, 688 (2) (500 SE2d

1) (1998). More specifically, libel per se involves, in relevant part, the following: "(1)

Imputing to another a crime punishable by law; (2) Charging a person with having

some contagious disorder or with being guilty of some debasing act which may

---

[10] In its order granting Mainstreet's motion to dismiss, the trial court noted that Morgan "did not file any opposing evidentiary material," and Morgan claims on appeal that the trial court erroneously "failed to consider [his] properly sworn pleadings, motions, and responses" as evidence opposing Mainstreet's anti-SLAPP motion. As an initial matter, it is not at all apparent what the trial court was referencing in this passing comment, and this may have been a reference to the fact that Morgan failed to squarely challenge the evidentiary materials filed by Mainstreet. In any event, it is obvious from both the order and the relevant transcript that the trial court was well versed with the matter at hand and considered the entirety of the record. Moreover, Morgan has failed to identify what "evidence" -- not just mere legal conclusions and hyperbole -- that the trial court somehow overlooked in his verified filings. "It is axiomatic that one seeking reversal must show not only error but also harm." *McClain v. George*, 267 Ga. App. 851, 854 (2) (600 SE2d 837) (2004). In short, Morgan has failed to articulate a factual or legal basis to reverse the trial court's order on this alleged error. Finally, we note that under our de novo standard, we review the entire record.

exclude him from society; (3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein." OCGA § 51-5-4 (a).[11] Further, libel per se must involve words "which are recognized as injurious on their face -- without the aid of extrinsic proof. Should extrinsic facts be necessary to establish the defamatory character of the words, the words may constitute [libel], but they do not constitute [libel] per se." (Citations and punctuation omitted.) *Bellemead, LLC v. Stoker*, 280 Ga. 635, 637 (631 SE2d 693) (2006). In short, we "must rely upon the words themselves in considering whether a statement was [libel] per se." *Zarach*, 231 Ga. App. at 688 (2).

Turning to Morgan's complaint, we are mindful that "[a] complaint is not required to set forth a cause of action, but need only set forth a claim for relief. If, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient." (Citation and punctuation omitted.) *Christner v. Eason*, 146 Ga. App. 139, 140 (245 SE2d 489) (1978). That said, it is obvious from Morgan's complaint that it is insufficient. His

---

[11] Although OCGA § 51-5-4 refers to slander and not libel, "the requirements for slander per se apply to libel per se because . . . the definition of slander in Georgia has been incorporated into the definition of libel." *Cottrell v. Smith*, 299 Ga. 517, 524 (II) (A) (788 SE2d 772) (2016).

15

complaint alleges libel per se and identifies six statements from the article that, he says, are actionable. However, none of the statements identified in the complaint -- indeed none of the language in the article that gives rise to his action, which is attached to his complaint as an exhibit -- rises to the level of libel per se.

The article's headline -- that Morgan's protests against his neighbor "backfires" -- is plainly non-actionable opinion. See *North Atlanta Golf Operations, LLC v. Ward*, 363 Ga. App. 259, 265 (2) (b) (i) (870 SE2d 814) (2022) (recognizing that mere statements of opinion or rhetorical hyperbole are not actionable and providing examples). According to the complaint, the article states that Morgan "in his capacity as an individual citizen is acting as a [BCC] councilman"; however, as the trial court noted below, there is no such language in the article. Another statement in the article about which Morgan complains -- that he opened up the April 2022 BCC meeting "by airing his grievances about his neighbors" -- is, according to Morgan's own complaint, true and, thus, cannot be defamatory.

Finally, the other portions of the article with which Morgan takes offense -- quotes from the Johnsons saying that Morgan is violating the code with a camper on his property, that one of their cows was "mysteriously shot," and that the Johnsons' animals are a source of contention for Morgan -- do not rise to the level of libel per

16

se because they do not charge that Morgan is guilty of a crime, dishonesty or immorality, and the article does not lodge an especially injurious accusation in reference to Morgan's trade, office, or profession. See *Cottrell*, 299 Ga. at 524 (II) (A). Accordingly, the trial court properly concluded that Morgan's complaint had no probability of success.

As discussed above, the trial court properly concluded that Mainstreet's publication fell within the protected categories of OCGA § 9-11-11.1 (c) and that Morgan's complaint had no probability of success. As such, the trial court properly granted Mainstreet's motion to dismiss, and the judgment of the trial court is affirmed.

*Judgment affirmed. Rickman, C. J., and Dillard, P. J., concur*.