312 Ga. 647
FINAL COPY

S20G1473.  AMERICAN CIVIL LIBERTIES UNION, INC. v. ZEH.

NAHMIAS, Chief Justice.

B. Reid Zeh filed a lawsuit alleging that the American Civil Liberties Union, Inc. ("ACLU") had published on its blog a post containing defamatory statements asserting that Zeh, who was the public defender for misdemeanor cases in Glynn County, had charged an indigent criminal defendant a fee for his public defense services. The ACLU moved to strike the defamation lawsuit pursuant to Georgia's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute, OCGA § 9-11-11.1.[1] Zeh then filed two motions requesting discovery. The trial court denied the

---

[1] SLAPPs are "meritless lawsuits brought not to vindicate legally cognizable rights, but instead to deter or punish the exercise of constitutional rights of petition and free speech by tying up their target's resources and driving up the costs of litigation." *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 257 (830 SE2d 119) (2019). Georgia's anti-SLAPP statute is designed to curtail SLAPPs by giving persons and entities "who believe[ ] they have been subjected to a SLAPP an avenue for ending the suit quickly, summarily, and at minimal expense." *Geer v. Phoebe Putney Health System, Inc.*, 310 Ga. 279, 282 (849 SE2d 660) (2020).

motion to strike without ruling on Zeh's discovery motions, and the Court of Appeals affirmed the denial of the anti-SLAPP motion in *American Civil Liberties Union, LLC v. Zeh*, 355 Ga. App. 731 (845 SE2d 698) (2020).[2]

This Court granted the ACLU's petition for certiorari to address what standard of judicial review applies in this situation and whether, under that standard, the trial court erred by denying the anti-SLAPP motion to strike. As explained below, after applying the proper standard of review to the existing record, we conclude that the trial court erred by denying the ACLU's motion to strike. We therefore reverse the Court of Appeals' decision upholding that ruling. But because the trial court failed to rule on Zeh's requests for discovery, we remand the case to the Court of Appeals with direction that it remand the case to the trial court to rule on the discovery motions and then proceed in a manner consistent with this opinion.

1. *The pertinent law and proper standard of judicial review.*

---

[2] Although the Court of Appeals' opinion referred to the "American Civil Liberties Union, LLC," the ACLU is actually a nonprofit corporation.

As we will discuss in detail in Division 2 below, this case involves an anti-SLAPP motion to strike a defamation claim brought under Georgia law. In certain circumstances, however, the First Amendment to the United States Constitution places substantial limitations on state defamation law. Whether such constitutional limitations apply to Zeh's defamation claim informs the standard by which we review the ACLU's motion to strike that claim, as well as our determination of whether the trial court erred by denying the motion on the current record. We therefore begin by outlining the two-part analysis of an anti-SLAPP motion to strike, the state law and federal constitutional law relating to Zeh's claim for defamation, and the standard of judicial review that applies in this case.

(a) *The two-part analysis of an anti-SLAPP motion to strike.*

Subsection (b) of the anti-SLAPP statute says in pertinent part:

> (b) (1) A claim for relief against a person or entity arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution

3

of the State of Georgia in connection with an issue of public interest or concern shall be subject to a motion to strike unless the court determines that the nonmoving party has established that there is a probability that the nonmoving party will prevail on the claim.

(2) In making the determination as provided for in paragraph (1) of this subsection, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based; provided, however, that if there exists a claim that the nonmoving party is a public figure plaintiff, then the nonmoving party shall be entitled to discovery on the sole issue of actual malice whenever actual malice is relevant to the court's determination under paragraph (1) of this subsection.

OCGA § 9-11-11.1 (b).[3]

---

[3] Other subsections of OCGA § 9-11-11.1 that are pertinent to the issues presented in this case are as follows:

(a) The General Assembly of Georgia finds and declares that it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech. The General Assembly of Georgia further finds and declares that the valid exercise of the constitutional rights of petition and freedom of speech should not be chilled through abuse of the judicial process. To accomplish the declarations provided for under this subsection, this Code section shall be construed broadly.

. . .

(c) As used in this Code section, the term "act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" shall include:

(1) Any written or oral statement or writing or petition

4

The text of paragraph (b) (1) makes clear that the analysis of an anti-SLAPP motion to strike involves two steps. See *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 261 (830 SE2d 119) (2019). First, the court must decide whether the party filing the anti-SLAPP motion (here, the ACLU) "has made a threshold showing that the challenged claim is one 'arising from' protected activity." Id. at 262 (quoting OCGA § 9-11-11.1 (b) (1)). If so, the court must "decide whether the plaintiff 'has established that there

made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;

(2) Any written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;

(3) Any written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern; or

(4) Any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern.

(d) All discovery and any pending hearings or motions in the action shall be stayed upon the filing of a motion to dismiss or a motion to strike made pursuant to subsection (b) of this Code section until a final decision on the motion. The motion shall be heard not more than 30 days after service unless the emergency matters before the court require a later hearing. The court, on noticed motion and for good cause shown, may order that specified discovery or other hearings or motions be conducted notwithstanding this subsection.

5

is a probability that the (plaintiff) will prevail on the claim.'" *Wilkes*, 306 Ga. at 262 (quoting OCGA § 9-11-11.1 (b) (1)).

The parties do not dispute that under the first part of this test, Zeh's defamation claim arises from protected activity. See *Wilkes*, 306 Ga. at 262 (explaining that a challenged claim arises from protected activity when it could reasonably be construed as fitting within one of the categories set forth in OCGA § 9-11-11.1 (c)). Thus, the dispositive issue in this case is whether Zeh has met his burden of establishing that there is a probability that he will prevail on his defamation claim.

(b) *The state law and federal constitutional law relating to Zeh's defamation claim.*

Under Georgia law, a claim for defamation has four elements:

> (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm.

*Mathis v. Cannon*, 276 Ga. 16, 20-21 (573 SE2d 376) (2002) (citation

and punctuation omitted).[4] As to the third element, a plaintiff's status as a "private" or "public" figure determines the level of fault with which he must prove that the defendant acted. See id. at 21; *Gettner v. Fitzgerald*, 297 Ga. App. 258, 262 (677 SE2d 149) (2009).

A plaintiff who is a private figure must establish, as a matter of Georgia law, that the defendant published the allegedly defamatory statements with at least ordinary negligence. See *Gettner*, 297 Ga. App. at 262. See also *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (94 SCt 2997, 41 LE2d 789) (1974) (explaining that as long as they do not impose liability without fault, "the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual"); *Triangle Publications, Inc. v. Chumley*, 253 Ga. 179, 180 (317 SE2d 534) (1984) (holding, as an issue of first impression under Georgia law, that a publisher who defames a

---

[4] The type of defamation at issue in this case is libel, which is the "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." OCGA § 51-5-1 (a).

7

private-figure plaintiff is held to a standard of ordinary care).

Since 1964, however, the United States Supreme Court has held that the First Amendment to the United States Constitution precludes the application of a state-law negligence standard in defamation cases when the plaintiff is a public official. In *New York Times Co. v. Sullivan*, 376 U.S. 254 (84 SCt 710, 11 LE2d 686) (1964), the Court held that the First Amendment

> prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

Id. at 279-280. Such actual malice must be proved by clear and convincing evidence. See *Gertz*, 418 U.S. at 334, 342 (explaining that in *New York Times*, the Court "intended to free criticism of public officials from the restraints imposed by the common law of defamation," and that "those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth").

8

Thus, if Zeh was a private figure at the time he was allegedly defamed, the *New York Times* standard does not apply (except to his claims for presumed and punitive damages, see footnote 5 below), and to establish fault under Georgia law, Zeh would be required to make a prima facie showing only that the ACLU negligently published the allegedly defamatory statements. On the other hand, if Zeh — as the misdemeanor public defender for Glynn County — was a public official and the ACLU's allegedly defamatory statements related to his official conduct, the more stringent constitutional standard applies. As we conclude in Division 3 below, Zeh was a public official and the ACLU's statements related to his official conduct, so the *New York Times* actual malice standard requires him to prove by clear and convincing evidence that the ACLU knew that the allegedly defamatory statements were false or made the statements with reckless disregard of whether they were false or not.[5]

---

[5] We note that the United States Supreme Court has extended the *New York Times* actual malice standard beyond "public officials" to plaintiffs who

9

are "public figures," see *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155 (87 SCt 1975, 18 LE2d 1094) (1967) (plurality opinion), meaning that the plaintiff has assumed a role of "especial prominence in the affairs of society," either for all purposes or for the limited purpose of the particular public controversy at issue. *Gertz*, 418 U.S. at 345. The Court has also held that even a private-figure plaintiff is required to prove actual malice in order to recover presumed or punitive damages if the defamatory statement was about a matter of public concern. See id. at 349-350.

We recognize that the Supreme Court's adoption of the actual malice standard as a matter of federal constitutional law applicable to defamation cases brought under state law was a sharp departure from tradition. Over the years since *New York Times*, the Court has acknowledged the negative effects its doctrine may have on incentives to speak the truth as well as the unfairness that may result to public figures about whom falsehoods are published, but the Court has deemed those consequences outweighed by the need to avoid self-censorship on matters of public concern. See, e.g., *Gertz*, 418 U.S. at 342 ("[The actual malice] standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test."); *St. Amant v. Thompson*, 390 U.S. 727, 731-732 (88 SCt 1323, 20 LE2d 262) (1968) ("It may be said that [the actual malice] test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies."). We also note that two Justices on that Court have recently called for reconsideration of this line of precedent. See *Berisha v. Lawson*, ___ U.S. ___, ___ (141 SCt 2424, 2425, 210 LE2d 991) (2021) (Thomas, J., dissenting from the denial of certiorari) (stating that "[t]his Court's pronouncement that the First Amendment requires public figures to establish actual malice bears 'no relation to the text, history, or structure of the Constitution'" and should also be reconsidered "because of the

(c) *The standard of judicial review that applies in this case.*

We generally review a trial court's ruling on an anti-SLAPP motion to strike de novo, see *Wilkes*, 306 Ga. at 263, viewing the pleadings and affidavits submitted by the parties in the light most favorable to the plaintiff (as the non-moving party). See, e.g., *RCO Legal, P.S., Inc. v. Johnson*, 347 Ga. App. 661, 661-662 (820 SE2d 491) (2018). See also OCGA § 9-11-11.1 (b) (2) (stating that in determining whether a plaintiff's claim is subject to a motion to strike, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based"). To establish a probability of prevailing on a defamation claim, "'the plaintiff must demonstrate that the

doctrine's real-world effects. Public figure or private, lies impose real harm" (quoting *Tah v. Global Witness Publishing, Inc.*, 991 F3d 231, 251 (D.C. Cir. 2021) (Silberman, J., dissenting)); id. at 2429-2430 (Gorsuch, J., dissenting from the denial of certiorari) (noting that "[m]any Members of this Court have raised questions about various aspects of [*New York Times*]," and "given the momentous changes in the Nation's media landscape since 1964, I cannot help but think the Court would profit from returning its attention, whether in this case or another, to a field so vital to the 'safe deposit' of our liberties"). But these are not debates in which our Court must engage, as we must apply the existing First Amendment doctrine established by the United States Supreme Court.

complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" *Wilkes*, 306 Ga. at 262 (quoting *Soukup v. Law Offices of Herbert Hafif*, 139 P3d 30, 51 (Cal. 2006)).[6]

> For purposes of this inquiry, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant; though the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. In making this assessment[,] it is the court's responsibility to accept as true the evidence favorable to the plaintiff.

*Soukup*, 139 P3d at 51 (citations, punctuation and emphasis omitted). In this regard, the merits of the plaintiff's claim are evaluated "'using a summary-judgment-like procedure at an early stage of the litigation.'" Id. at 42 (citation omitted).

---

[6] In *Wilkes*, this Court explained that when interpreting OCGA § 9-11-11.1 as it was amended in 2016 "to substantially track California's anti-SLAPP procedure as set out in California Code of Civil Procedure § 425.16," we may look for guidance to California's more extensive case law interpreting similar provisions of that state's anti-SLAPP code. *Wilkes*, 306 Ga. at 257-258.

12

This approach is consistent with the United States Supreme Court's direction as to how a court should view the evidence in deciding a summary judgment motion in a case involving a defamation claim by a public figure.

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (106 SCt 2505, 91 LE2d 202) (1986). See also *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (111 SCt 2419, 115 LE2d 447) (1991) (explaining that in reviewing a summary judgment ruling in a public-figure defamation case, a court "must draw all justifiable inferences in favor of the [plaintiff, as the] nonmoving party, including questions of credibility and of the weight to be accorded particular evidence").

But while viewing the evidence in this light, the court must also take into account the substantive evidentiary and legal standards that apply to such a defamation case. Thus, the Supreme

13

Court has held that at the summary judgment stage of a defamation claim brought by a public figure, a court determining if a genuine factual issue as to actual malice exists

> must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

*Anderson*, 477 U.S. at 254.

Indeed, the Supreme Court has instructed that in determining whether a public-figure plaintiff has proven actual malice by clear and convincing evidence, the reviewing court must conduct "'an independent examination of the whole record'" to ensure that "'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (104 SCt 1949, 80 LE2d 502) (1984) (quoting *New York Times*, 376 U.S. at 284-286). See also *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 686 (109 SCt 2678, 105 LE2d 562) (1989) ("[J]udges, as expositors of the Constitution, have a duty

to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice." (citation and punctuation omitted)). Lower courts have regularly followed this direction at the summary judgment stage of public-figure defamation cases. See, e.g., *Levesque v. Doocy*, 560 F3d 82, 86-87 (1st Cir. 2009) (reviewing de novo a summary judgment ruling that a public-figure plaintiff had not shown clear and convincing evidence of actual malice, "conduct[ing] an independent review of the entire record" while "view[ing] the record in the light most favorable to the non-movant"); *Compuware Corp. v. Moody's Investors Svcs., Inc.*, 499 F3d 520, 525-526 (6th Cir. 2007) (reviewing de novo the trial court's grant of summary judgment on a defamation claim brought by a public-figure plaintiff that failed to produce sufficient evidence of actual malice, noting that the court must "make an independent examination of the whole record" while viewing "the evidence, all facts, and any inferences in the light most favorable to the nonmoving party" (citation and punctuation

15

omitted)); *Chafin v. Gibson*, 578 SE2d 361, 367-368 (W.Va. 2003) (reviewing de novo the trial court's grant of summary judgment on a defamation claim brought by public-official plaintiffs who failed to produce sufficient evidence of actual malice, and explaining that the court "must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice" while "construing the evidence in a light most favorable to the [plaintiffs]" (citation and punctuation omitted)).

Applying these principles, we will review de novo the trial court's denial of the ACLU's anti-SLAPP motion to strike Zeh's public-official defamation claim, viewing the defamation case pleadings and affidavits and all justifiable inferences drawn therefrom in the light most favorable to Zeh as the non-moving party, but independently reviewing the whole record as to the issue of actual malice to determine whether the evidence satisfies the standard of clear and convincing evidence of actual knowledge or reckless disregard that the disputed statements were false so that

"'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose*, 466 U.S. at 499 (citation omitted).[7]

2. *Procedural history and pertinent facts in the record.*

Viewing the defamation case pleadings and affidavits in this way, the existing record shows the following regarding the procedural history and pertinent facts of this case.

(a) *The federal civil rights lawsuit against Zeh and others.*

From 2013 until July 2018, Zeh served as the appointed public defender for all misdemeanor criminal cases in the State Court of Glynn County.[8] In March 2018, lawyers from the American Civil

---

[7] We note that in granting certiorari, we asked the parties to address the question of whether the requirement of independent review applies to any of the elements of a defamation claim other than actual malice. But as discussed in Division 4 below, because we need only address whether the ACLU acted with actual malice to determine that Zeh has not established a probability of prevailing on his claim on the current record, we need not answer that question, which other courts have not answered consistently. Compare, e.g., *Veilleux v. National Broadcasting Co.*, 206 F3d 92, 106-108 (1st Cir. 2000) (holding that the independent-review requirement also applies to review of whether a media defendant's allegedly defamatory statements were "provable as false"), with, e.g., *Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc.*, 179 SW3d 785, 789-790 (Ky. 2005) (holding that the element of falsity in a defamation claim under Kentucky law is "based on common law libel not affected by the constitutional element of actual malice" and declining to independently review the jury's finding as to falsity).

[8] The record does not indicate who appointed Zeh to this position.

Liberties Union Foundation ("ACLU Foundation")[9] filed in the United States District Court for the Southern District of Georgia a civil rights lawsuit against Glynn County, the County's chief magistrate judge and sheriff, and Zeh, as the "Glynn County Misdemeanor Public Defender." The lawsuit was brought on behalf of two putative classes of plaintiffs who were charged with misdemeanor crimes in Glynn County State Court, alleging that they were subject to a "two-tiered pretrial justice system" in which "[t]hose who cannot afford a predetermined monetary bail or to hire a private attorney are jailed indefinitely, while those who can pay go free." The first class of individuals, who had been detained pretrial because they were unable to pay a money bond, claimed that the County, the chief magistrate judge, and the sheriff had violated certain of their constitutional rights. The second class of individuals, who qualified for representation by a public defender, claimed that the County and Zeh, in his individual and official capacity, violated

---

[9] The ACLU notes in its brief here that although it (the ACLU nonprofit corporation) works closely with the ACLU Foundation, the two entities are distinct.

their rights to equal protection and due process under the Fourteenth Amendment to the United States Constitution and their right to counsel under the Sixth Amendment. As to this class's claims, the federal complaint alleged that Zeh, who contracted with Glynn County to provide public defense services for all State Court misdemeanor cases, "determine[d] whether or not an individual [wa]s eligible to receive public defense representation, based on unknown criteria," and "enforce[d] a policy of delaying representation to misdemeanor arrestees until well after their bail ha[d] already been set."

On June 26, 2018, the ACLU Foundation lawyers, on behalf of the putative classes, filed a motion for leave to file an amended complaint. In addition to the allegations against Zeh in the original complaint, the proposed amended complaint alleged that Zeh, in delaying representation to indigent individuals charged with misdemeanor crimes, "act[ed] for Glynn County as he is specifically set apart from the state-funded Circuit Public Defender's Office and paid a flat monthly rate by Glynn County." The proposed amended

19

complaint also added, among other things, Robert Cox as a plaintiff and prospective class representative, alleging that over the course of four arrests for misdemeanor crimes in Glynn County between June 3, 2016 and May 30, 2018, Cox "was imprisoned for approximately 171 days solely because he could not afford to pay a secured bail requirement." The proposed amended complaint also alleged that Cox and the other class representatives could not afford to hire a lawyer; that they were therefore eligible for representation by Zeh as the only public defender for defendants charged with misdemeanor crimes in State Court; and that during their pretrial incarceration, they had never met with Zeh, who had "a policy of not visiting public defense clients in the detention center, representing clients at their bail setting proceedings, or requesting a preliminary hearing or bail modification hearings on their behalf." The proposed amended complaint asserted that Zeh failed "to reach out to, screen, or timely appoint himself to represent . . . Cox, amounting to a reckless indifference to . . . Cox's federally protected rights under the Sixth and Fourteenth Amendments."

In addition, the proposed amended complaint added Cox's mother, Barbara Hamilton, as a non-class plaintiff, alleging that in April 2015, she paid Zeh $2,500 to represent Cox as his public defender on a misdemeanor charge. Hamilton — not Cox or the plaintiff classes — asserted claims of theft and fraud under Georgia law against Zeh in his individual capacity and sought compensatory damages, claiming that he "took $2,500 of [her] personal property by threatening to withhold action as a public official — namely, to refuse to undertake his duties as public defender in representing her son . . . without a $2,500 payment." In addition, the motion to amend the complaint asserted that Hamilton's and the classes' claims each involved Zeh's "deficient outreach, screening, and appointment practices for persons seeking his help as misdemeanor public defender" and that "Zeh's refusals to substantively represent his misdemeanor public defense clients without additional payment is part and parcel of his general refusal to timely screen clients or

appear in their cases."[10]

As exhibits to the motion to amend the federal complaint, the ACLU Foundation lawyers attached sworn declarations from Cox and Hamilton. Cox's declaration said the following. He "struggled with an alcohol abuse disorder," had "a significant criminal history," was "unable to keep a job," and had been "charged with misdemeanors in Glynn County more times than [he] can remember." Each time Cox was charged with a misdemeanor offense, Zeh represented him, although "[n]o one told [Cox] about a public defender" and Cox did "not know how [Zeh] was appointed." Cox would meet Zeh in court and plead guilty, without having consulted with Zeh before his guilty pleas. After Cox was arrested about seven times, he went to court for one of his cases, where the judge directed Cox "to see the public defender, Mr. Zeh." Cox went to Zeh's office, where Zeh "indicated that he would charge [Cox] an

---

[10] The proposed amended complaint also added the Glynn County State Court judge as a defendant, sought punitive damages against Zeh for his alleged failure to adequately represent Cox, and included additional allegations regarding the basis for the defendants' liability and the damages sought.

22

additional $2,500 to represent [Cox] as [his] public defender." Cox, who "had no money," believed that he would have to represent himself or hire a private attorney if he did not pay the fee. Cox told his mother Hamilton about the fee, and she "must have paid" Zeh because the charges were later dropped. Zeh also "represented to [Cox] that [Zeh] does not take cases to trial for public defense clients without extra money."

Cox further declared that his "attorneys in [the federal] case ha[d] refreshed [his] memory by sharing a handful of [his] court records," and "[b]ased on reviewing those records, [Cox] describe[d] a few of [his] cases over the last several months." Cox then detailed four arrests in 2016 and 2017 — for misdemeanor charges of theft by taking, public drunkenness, and criminal trespass — after each one of which he could not afford to pay a pretrial money bond, so he spent a total of 171 days in jail. Cox "knew that [he] would see . . . Zeh when [Cox] walked into court," but Zeh "never visited [him] in jail" while his misdemeanor charges were pending. Cox has "had no income" since 2015.

Hamilton swore the following in her declaration. Cox had "long suffered from an alcohol use disorder," and he had been charged with misdemeanor crimes "numerous times" and represented by his public defender Zeh. In 2015, after Cox told her that "Zeh would not represent him in a misdemeanor case unless [Cox] came up with $2,500 to pay . . . Zeh," she "paid . . . Zeh $2,500 to take on [Cox's] case as his public defender" because Cox "could not afford to pay . . . Zeh." Hamilton "was not aware that . . . Zeh was already paid by Glynn County to take misdemeanor criminal cases for indigent persons."[11]

(b) *The ACLU's allegedly defamatory statements.*

On June 27, 2018, the day after the ACLU Foundation lawyers filed the motion to amend the federal complaint, the ACLU

[11] On July 24, 2018, about a month after the ACLU Foundation lawyers filed the motion to amend the federal complaint, Zeh filed a response opposing the motion to amend and generally denying Cox's and Hamilton's claims. On the same day that Zeh filed his response, the ACLU Foundation lawyers filed an amended motion for leave to amend the complaint, attaching as an exhibit, among other things, a revised proposed amended complaint. Nothing in the record indicates that the federal court ever ruled on the motion or amended motion to amend the federal complaint. The ACLU says in its brief here that the court did not rule on the motions before the federal lawsuit was ultimately dismissed pursuant to a settlement agreement in July 2019.

24

published on its blog a post about Zeh entitled, "Glynn County, Georgia's Crooked Public Defender." The post, which included a photo of Zeh, said that when Cox and Hamilton sought representation after Cox was charged with a misdemeanor, Zeh charged them $2,500 for his services.

The blog post also said, among other things, that "*Zeh routinely ignores his clients or worse — extorts them* to enrich himself"; "*Zeh took advantage of [Cox and Hamilton] by charging them $2,500 for services that should have been free-of-charge*"; and Cox and Hamilton "didn't know that *Zeh could not legally or ethically require payment from them*" because "*the county was paying Zeh to provide public defense services.*"[12] The blog post then said:

> *Pushing Cox and his family to pay fees they didn't need to was effectively the last time Zeh took an interest in Cox's cases.* In the last two years, Cox spent over 170 days in jail because he could not afford bail on various misdemeanor charges such as trespassing and misdemeanor theft and not once did Zeh visit him or help him request a bail amount he could afford. Zeh only met with Cox to process a guilty plea, but he was a ghost during Cox's long periods of pretrial incarceration and

---

[12] The italicized statements above and in the next quoted passage are the ones that Zeh later claimed were false and defamatory.

first appearance in court.

> That's why this week we're seeking permission from the [federal court] to add Cox and Hamilton to our lawsuit against Zeh for his role in perpetuating Glynn County's wealth-based incarceration system and for failing to provide legal assistance to his clients who cannot afford a private attorney.[13]

The blog post also stated that Zeh had represented two other named plaintiffs in the federal case and had failed to seek modifications to their bail, which they could not afford to pay. The post said that the federal lawsuit would "hold people like Zeh and other local officials accountable" and requested that people who had a "similar experience with the misdemeanor public defense system in Glynn County" contact the ACLU. On the same day that the ACLU published its blog post, the Brunswick News Publishing

---

[13] The phrase "seeking permission" in the blog post hyperlinked to a June 26 post on the ACLU Georgia website entitled, "ACLU ACCUSES PUBLIC DEFENDER OF EXTORTING $2,500 FROM 75-YEAR-OLD WOMAN FOR SON'S DEFENSE." That post described the federal case and included links to PDF copies of the motion to amend the complaint in that case, the proposed amended complaint, and Cox's and Hamilton's declarations. The ACLU also published a paid advertisement on Facebook that included a photo of Zeh, contained a hyperlink to the blog post, and said, "Rather than trying to get his clients out of jail, this public defender extorts money from them." Zeh's defamation lawsuit did not allege that the website post or Facebook ad were defamatory.

Company ("Brunswick News") published an article about the allegations against Zeh with the headline, "ACLU alleges lawyer 'extorted' arrestee's mother for son's defense."

(c) *Zeh's defamation claim.*

About two months later, in August 2018, Zeh filed a lawsuit in the Glynn County Superior Court alleging a single claim of defamation against the ACLU and the Brunswick News. As to the ACLU, he contended that the blog post statements italicized above were defamatory. In his complaint and in an affidavit filed about two months later, Zeh said the following. In 2015, he was the misdemeanor public defender for the State Court of Glynn County; he also maintained a private practice representing defendants in other courts. On April 1, 2015, Cox was arraigned in State Court on a misdemeanor shoplifting charge. Zeh was present in court but was not involved in Cox's case. Cox attempted to plead guilty to the misdemeanor, but the prosecutor announced that Cox had been convicted of several prior shoplifting offenses and that he planned to transfer Cox's case to the Superior Court to be prosecuted as a

27

felony. The State Court judge advised Cox to consult with a lawyer, and later that afternoon, Cox conferred with Zeh in his private practice office to seek representation on the felony charge. Zeh provided Cox with a copy of an e-mail from the prosecutor showing his intent to transfer the case to the Superior Court to be prosecuted as a felony. Cox "had never been convicted of a felony, and it was important to [him] that he maintain that record." Zeh, Cox, and "later [Hamilton] via telephone" agreed that Zeh would be compensated $2,500 in exchange for his professional services, and Hamilton mailed a check for that amount to Zeh's private office.

Zeh's affidavit also said that Cox and Hamilton never expressed confusion about whether Zeh was representing Cox as a public defender, and Cox did not indicate that he sought representation by a public defender. Zeh understood "from what [he] was told by others" that Cox was employed around the time he consulted with Zeh. A few days later, on April 6, Cox's misdemeanor charge was upgraded to a felony and his case was transferred to the Superior Court, where Zeh filed an entry of appearance on April 16

28

to represent Cox and ultimately secured a dismissal of the felony charge. Zeh "never t[ook] money from a client in [his] role as a public defender."[14]

Zeh also alleged in his complaint that although he had demanded that the ACLU retract its statements, it had refused to do so. He sought compensatory and punitive damages, attorney fees, and costs of litigation. He also alleged that the statements constituted defamation per se, such that damages were presumed.[15]

(d) *The ACLU's anti-SLAPP motion to strike.*

---

[14] Zeh attached as exhibits to his affidavit, among other things, Cox's April 1, 2015 notice of arraignment in State Court for misdemeanor shoplifting; an April 1 e-mail between the prosecutors discussing transferring the case to the Superior Court and an April 6 e-mail saying that the case was being "transferr[ed] today"; the State's April 6 motion to transfer the case; the State Court's order transferring the case that same day; a copy of a check from Hamilton to Zeh for $2,500 signed on April 1; and Zeh's entry of appearance in the Superior Court felony case.

[15] Defamation per se may include, among other things, "[i]mputing to another a crime punishable by law" and "[m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein[.]" OCGA § 51-5-4 (a) (1) and (3) (defining slander per se). See also *Cottrell v. Smith*, 299 Ga. 517, 524 (788 SE2d 772) (2016) (explaining that "the requirements for slander per se apply to libel per se because . . . the definition of slander in Georgia has been incorporated into the definition of libel"). Defamation per se does not require proof of special damages; rather, damages are inferred. See OCGA § 51-5-4 (b); *Cottrell*, 299 Ga. at 522-523.

In late September 2018, the Brunswick News filed a motion to strike Zeh's complaint under the anti-SLAPP statute, see OCGA § 9-11-11.1, contending that the statements in its article were conditionally privileged under OCGA §§ 51-5-5 and 51-5-7 and that Zeh was a public official for the purpose of applying the *New York Times* standard.[16] In early October, the ACLU filed its answer to

---

[16] OCGA § 51-5-5 says:

In all actions for printed or spoken defamation, malice is inferred from the character of the charge. However, the existence of malice may be rebutted by proof. In all cases, such proof shall be considered in mitigation of damages. In cases of privileged communications, such proof shall bar a recovery.

OCGA § 51-5-7 says:

The following communications are deemed privileged:

(1) Statements made in good faith in the performance of a public duty;

(2) Statements made in good faith in the performance of a legal or moral private duty;

(3) Statements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned;

(4) Statements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern, as defined in subsection (c) of Code Section 9-11-11.1;

(5) Fair and honest reports of the proceedings of legislative or judicial bodies;

(6) Fair and honest reports of court proceedings;

(7) Comments of counsel, fairly made, on the circumstances

30

Zeh's complaint, asserting, among other things, that Zeh was a public official who must prove actual malice as a matter of constitutional law. The ACLU also filed an anti-SLAPP motion to strike the complaint, contending that Zeh failed to establish under the second part of the anti-SLAPP test a probability that he would prevail on his defamation claim. See OCGA § 9-11-11.1 (b) (1). Citing OCGA § 51-5-7 as well as cases applying the *New York Times* standard, the ACLU argued that the blog post statements were conditionally privileged because (among other things) Zeh could not show that the ACLU published the statements with actual malice.

Along with the anti-SLAPP motion, the ACLU filed affidavits from the blog post's author, Erika Basurto (a paralegal for the

---

of a case in which he or she is involved and on the conduct of the parties in connection therewith;

(8) Truthful reports of information received from any arresting officer or police authorities; and

(9) Comments upon the acts of public men or public women in their public capacity and with reference thereto.

A defendant may establish that a conditional privilege under OCGA § 51-5-7 applies if he shows "good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons." *Neff v. McGee*, 346 Ga. App. 522, 526 (816 SE2d 486) (2018) (citation and punctuation omitted).

federal case), and its editors, Andrea Woods (the lead attorney for the federal case) and Ryan Karerat (an ACLU communications strategist), saying that they had consulted filings in the federal case to ensure that the blog post accurately reflected the allegations against Zeh and that they had no knowledge, information, or belief that any of the factual statements in the post were incorrect. Karerat's affidavit attached as exhibits, among other things, the motion to amend the federal complaint, the proposed amended complaint, a redline version of that document showing changes from the original complaint, and Cox's and Hamilton's sworn declarations.

In late October 2018, Zeh filed responses opposing the Brunswick News's and the ACLU's motions to strike his defamation claim. In his response to the ACLU's motion, he contended, among other things, that there was a probability that he would prevail on his defamation claim because the ACLU's statements were not conditionally privileged. Zeh's response asserted that he was not a public official or public figure, but he also filed a motion for

discovery, arguing that to the extent the trial court found that he was a public figure, the parties should conduct discovery on the issue of whether the ACLU published the blog post statements with actual malice. See OCGA § 9-11-11.1 (b) (2).

On October 24, 2018, the trial court heard oral arguments on the motions to strike. The ACLU contended, among other things, that Zeh was a public official or at least a limited purpose public figure. Zeh argued that he was not a public figure because he represented Cox as a private lawyer. In November 2018, Zeh filed another motion to conduct discovery by deposing Cox and Hamilton as well as the author and editors of the blog post, arguing that he had shown good cause under OCGA § 9-11-11.1 (d) because the memories of those individuals "[were] fading while the [c]ourt t[ook] the [d]efendants' motions to [strike] under advisement." On May 15, 2019, the trial court issued orders granting the Brunswick News's motion to strike but summarily denying the ACLU's motion. The court did not rule on Zeh's motions for discovery. The ACLU

appealed.[17]

(e) *The Court of Appeals' decision.*

In June 2020, the Court of Appeals affirmed the denial of the ACLU's anti-SLAPP motion to strike, concluding that Zeh had shown that there was a probability that he would prevail on his defamation claim. See *Zeh*, 355 Ga. App. at 736. As to the threshold determination of whether Zeh qualified as a public official, the Court of Appeals held summarily that Zeh "made a prima facie showing that, as a part-time misdemeanor public defender, he is not a public official under the standard of *New York Times*." *Zeh*, 355 Ga. App. at 736 (footnote omitted). In support of that conclusion, the court cited only *New York Times* and *Ellerbee v. Mills*, 262 Ga. 516, 516-517 (422 SE2d 539) (1992), in which this Court held that a high school principal was not a public official for the purpose of invoking the *New York Times* constitutional standard. See *Zeh*, 355 Ga. App. at 736 & nn.17-18.

---

[17] Zeh filed a notice of appeal from the order granting the Brunswick News's motion to strike, but he later filed a motion to withdraw the appeal, which the Court of Appeals granted in October 2019.

The Court of Appeals accordingly analyzed Zeh's defamation claim under Georgia law rather than applying the constitutional standard requiring a showing of actual malice, holding that Zeh had sufficiently proven that the blog post statements were not conditionally privileged under OCGA § 51-5-7 because the ACLU made the statements with malice rather than in good faith. See *Zeh*, 355 Ga. App. at 735. The Court of Appeals noted that Zeh did not represent Cox until after the prosecutor had announced his intention to transfer Cox's case to the Superior Court to be prosecuted as a felony and that the case was transferred a few days later, more than three years before the ACLU published the statements on its blog. See id. at 736.

The Court of Appeals then held that the ACLU's fault amounted "at [l]east to [n]egligence" because Zeh "made a prima facie showing that the ACLU should have determined from public court records whether there was any truth to Cox's contentions." *Zeh*, 355 Ga. App. at 736. In a footnote, the court referenced the statements in Cox's declaration that he struggled with alcoholism,

35

that "he had been charged with misdemeanors in Glynn County more times than he could remember," that his lawyers had "refreshed (his) memory by sharing a handful of (his) court records," and that based on his review of those records, Zeh charged him $2,500 to represent him as his public defender in the misdemeanor case. Id. at 736 n.19 (punctuation omitted).[18]

We granted the ACLU's petition for certiorari.

3. *Zeh qualifies as a public official.*

In determining the applicable standard of judicial review in Division 1 above, we said that Zeh was a public official with regard to the ACLU's allegedly defamatory statements, such that the *New York Times* constitutional actual malice standard applies. We now

---

[18] The Court of Appeals also held that Zeh had made a prima facie showing that the blog post statement that in his role as a public defender, Zeh "extorted" his clients by "charging them $2,500 for services that should have been free-of-charge" was false and defamatory because it "implie[d] an assertion of objective fact." *Zeh*, 355 Ga. App at 734-735 (punctuation omitted). In addition, the court determined that Zeh had sufficiently alleged special damages in affidavits he filed in November 2018, which alleged loss of income from his law practice and damage to his reputation, and that damages were also inferred because he had established a prima facie case that the blog post statements constituted defamation per se. See id. at 736.

explain why this is so.[19]

In *New York Times*, the United States Supreme Court held that the libel plaintiff's position as an elected city commissioner clearly made him a "public official," but the Court declined to "determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of [the constitutional actual malice standard], or otherwise to specify categories of persons who would or would not be included." 376 U.S. at 283 n.23. Two years later, in *Rosenblatt v. Baer*, 383 U.S. 75 (86 SCt 669, 15 LE2d 597) (1966), the Court established a test for determining whether a plaintiff qualifies as a "public official" for the purpose of applying the *New York Times* standard.

The *Rosenblatt* Court began by rejecting any reliance on "state-law standards," explaining that "[s]tates have developed definitions

---

[19] We note that it appears undisputed that the constitutional actual malice test applies to Zeh's defamation claim to the extent that he seeks presumed or punitive damages from the ACLU, whose disputed statements clearly related to matters of public concern. See *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 756-763 (105 SCt 2939, 86 LE2d 593) (1985); *Gertz*, 418 U.S. at 349-350. Thus, an actual malice analysis is required to evaluate certain parts of this case in any event.

of 'public official' for local administrative purposes, not the purposes of a national constitutional protection" so "[i]f existing state-law standards reflect the purposes of *New York Times*, this is at best accidental." *Rosenblatt*, 383 U.S. at 84. Noting that the Court had expressed in *New York Times* "'a profound national commitment to the principle that debate on public issue[s] should be uninhibited, robust, and wide-open, and that (such debate) may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials,'" the Court held that "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt*, 383 U.S. at 85 (emphasis omitted) (quoting *New York Times*, 376 U.S. at 270).

Thus, "[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of

38

all government employees," the actual malice standard applies. *Rosenblatt*, 383 U.S. at 86. "The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." Id. at 86 n.13. Whether a plaintiff in a defamation action is a public official subject to the *New York Times* standard is a mixed question of law and fact for a court to determine "on a case-by-case basis." *Purvis v. Ballantine*, 226 Ga. App. 246, 249 (487 SE2d 14) (1997).

In this case, the Court of Appeals did not mention the test set forth in *Rosenblatt* and instead, with only an unexplained citation of *Ellerbee*, concluded summarily that "as a part-time misdemeanor public defender, [Zeh] is not a public official." *Zeh*, 355 Ga. App. at 736.[20] But under *Rosenblatt*'s test, Zeh — as Glynn County's

---

[20] In *Ellerbee*, this Court held that a public high school principal "under normal circumstances" was not a public official, explaining that "implicit in the reasoning of *New York Times* is the concept that the people should be free to question and criticize those who *govern* them" and "[p]rincipals, in general, are removed from the general conduct of government, and are not policymakers at the level intended by the *New York Times* designation of public official."

appointed public defender for all indigent defendants charged with misdemeanor crimes in the County's State Court — had, or at least appeared to the public to have had, substantial responsibility for the conduct of government affairs, namely, the County's misdemeanor public defense system. The facts set forth in the defamation case pleadings and affidavits show that Zeh was appointed to his position to provide public defense services for *all* misdemeanor cases in State Court, and as a matter of law, he had the responsibility for determining whether or not a defendant in a misdemeanor case was entitled to a public defender because of indigency. See OCGA § 17-

---

*Ellerbee*, 262 Ga. at 516-517 (emphasis in original). Rejecting the contrary holding of two other states' courts, *Ellerbee* endorsed *McCutcheon v. Moran*, 425 NE2d 1130 (Ill. App. 1981), which held that a school principal was not a public official because a principal's relationship "with the conduct of government is far too remote," id. at 1133. See *Ellerbee*, 262 Ga. at 516-517 & n.1. *Ellerbee*'s reasoning, however, is inconsistent with *Rosenblatt*, as Justice Fletcher explained in his special concurrence in *Ellerbee*, see 262 Ga. at 518-519, and as indicated by the widespread application of the public official designation to persons who clearly do not "govern" the public or set significant policy. See, e.g., *Pierce v. Pacific & Southern Co.*, 166 Ga. App. 113, 116 (303 SE2d 316) (1983) (holding that a police officer was a public official subject to the *New York Times* standard). See generally Danny R. Veilleux, Annotation, *Who is "public official" for purposes of defamation action*, 44 ALR 5th 193 (collecting cases). We therefore disapprove of *Ellerbee*'s reasoning, although we need not decide in this case whether *Ellerbee* reached the correct result as to the high school principal at issue there.

12-24 (a) ("The circuit public defender, any other person or entity providing indigent defense services, or the system established pursuant to Code Section 17-12-80 shall determine if a person . . . arrested, detained, or charged in any manner is an indigent person entitled to representation under this chapter."). See also *Allen v. Daker*, 311 Ga. 485, 502-503 (858 SE2d 731) (2021).

The proper provision of constitutionally required legal representation for indigent criminal defendants in Glynn County's misdemeanor cases is a matter in which the public has an independent interest. Cf. *Vermont v. Brillon*, 556 U.S. 81, 93-94 (129 SCt 1283, 173 LE2d 231) (2009) (explaining in the context of the constitutional right to a speedy trial that a public defender's conduct during the representation of a defendant is not attributable to the State, but systemic, institutional issues with the public defender system are the responsibility of the State). Because Zeh was the sole government official responsible for providing those services and determining who was eligible to receive them, his position "ha[d] such apparent importance that the public ha[d] an independent

41

interest in [his] qualifications and performance." *Rosenblatt*, 383 U.S. at 86. Zeh argues in his brief here that he was merely a "part-time" public defender. But the fact that Zeh maintained a private legal practice in addition to his appointed government position does not diminish his substantial responsibility for the misdemeanor public defense system in Glynn County.

Furthermore, under the requirement set forth in *New York Times*, the ACLU's blog post statements "relat[ed] to [Zeh's] official conduct," 376 U.S. at 279, because the statements claimed that Zeh, as Glynn County's public defender for defendants charged with misdemeanor crimes, ignored and extorted his indigent clients. The ACLU's post accused Zeh of being a "crooked public defender," ignoring his clients, requiring an indigent defendant to pay for representation, "perpetuating Glynn County's wealth-based incarceration system," and "failing to provide legal assistance to his clients who cannot afford a private attorney." Moreover, the post highlighted the federal class action lawsuit against Zeh, the County, and other County government officials, which alleged that Zeh, in

his public position, not only unlawfully charged Cox and Hamilton a fee for his public defense services but also and more broadly "enforced a policy of delaying representation to misdemeanor arrestees" and "ha[d] a policy of not visiting public defense clients in the detention center, representing clients at their bail setting proceeding, or requesting a preliminary hearing or bail modification hearings on their behalf."

Under these circumstances, Zeh was a public official at the time the ACLU published the allegedly defamatory statements, which clearly related to his official conduct, so the *New York Times* actual malice standard applies to his defamation claim. See *Garrison v. State of Louisiana*, 379 U.S. 64, 77 (85 SCt 209, 13 LE2d 125) (1964) (explaining that because the *New York Times* test "protects the paramount public interest in a free flow of information to the people concerning public officials, their servants . . . , anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these

43

characteristics may also affect the official's private character");

*Gertz,* 418 U.S. at 344 (explaining that "[a]n individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs," and "runs the risk of closer public scrutiny than might otherwise be the case").[21]

---

[21] It appears that until the Court of Appeals' opinion in this case, no Georgia appellate court had considered whether the *New York Times* "public official" designation applied to a public defender. Cf. *Fiske v. Stockton*, 171 Ga. App. 601, 601-602 (320 SE2d 590) (1984) (noting that a district attorney was a public official). The only two cases we have found addressing whether a county public defender was a public official under *New York Times* have held that he was one (as we hold with regard to Zeh). See *Young v. County of Marin*, 195 Cal. App. 3d 863, 873 (Cal. Dist. Ct. App. 1987) (holding in a defamation case that the plaintiff, an appointed county public defender, was "obviously a public official"); *Parrish v. Gannett River States Publishing Corp.*, Case No. 2:93CV238PS, 1994 WL 159533, at *3 (S.D. Miss. 1994) (concluding in a defamation case that the plaintiff, a county public defender, was a public official).

In arguing that Zeh qualifies as a public official, the ACLU cites *Tague v. Citizens for Law and Order, Inc.*, 75 Cal. App. 3d Supp. 16 (Cal. App. Dept. Super. Ct. 1977), a defamation case which held that an assistant public defender was a public official because he was responsible for felony cases, including discretionary control over pretrial matters, trials, and sentencing, and discharging the government's "constitutionally prescribed duty to provide legal representation to indigent criminal defendants." Id. at 23-24. In response, Zeh cites another California case, *James v. San Jose Mercury News, Inc.*, 17 Cal. App. 4th 1 (Cal. Dist. Ct. App. 1993), which "disagree[d] with *Tague*," concluding that a deputy public defender was not a public official under *New York Times* because he differed from a private criminal defense attorney "only in the happenstance of his . . . employment," as "[s]uch control as he . . . may exercise over the management of a particular case must invariably be controlled in turn by considerations of the best interests of the individual

44

4. *Based on the current record, Zeh has not shown actual malice.*

We turn next to whether Zeh has established that there is a probability that he will prevail on his defamation claim under the second part of the anti-SLAPP test. See OCGA § 9-11-11.1 (b) (1); *Wilkes*, 306 Ga. at 262. Because we have determined that Zeh is a public official, the *New York Times* constitutional standard applies in this case rather than the Georgia-law fault standard applied by the Court of Appeals. See *Zeh*, 355 Ga. App. at 735-736. Accordingly, putting aside other elements, to prevail on his defamation claim, Zeh

_____

client, tempered only by professional constraints applicable to all attorneys." *James*, 17 Cal. App. 4th at 10-11. But these cases dealt with whether an *assistant* or *deputy* public defender was a public official, not whether a county public defender was a public official responsible for more than just "the management of a particular case." Id. at 11. In this respect, we note again that although Zeh focuses on the ACLU's statements about Cox's 2015 case in the Glynn County courts, those statements were made in the context of a blog post about a federal case challenging Zeh's general policies as the Glynn County State Court's misdemeanor public defender, including as to Cox in other misdemeanor cases.

Although we determine, on the current record and under the particular circumstances of this case, that Zeh qualifies as a public official for *New York Times* purposes, we do not hold today that *all* attorneys providing public defense services are public officials. Rather, whether a plaintiff qualifies as a public official is a matter to be determined "on a case-by-case basis." *Purvis*, 226 Ga. App. at 249.

must prove by clear and convincing evidence that the ACLU published the blog post statements with actual malice. See *New York Times*, 376 U.S. at 279-280. Based on the current record, Zeh cannot satisfy this demanding standard.[22]

As this Court has explained:

> Actual malice in a constitutional sense is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity. Actual or constitutional malice is different from common law malice because knowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself. Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation.

*Cottrell v. Smith*, 299 Ga. 517, 525-526 (788 SE2d 772) (2016) (citation and punctuation omitted). "The actual malice inquiry is based on what the writer knew when he wrote it, and the [plaintiff]

---

[22] In particular, for purposes of our analysis, we will assume (without deciding) that Zeh has shown that the disputed statements in the blog post were false.

must show that the writer had a 'subjective awareness of probable falsity' when the material was published." *Jones v. Albany Herald Publishing Co.*, 290 Ga. App. 126, 132 (658 SE2d 876) (2008) (citations omitted). See also *Harte-Hanks*, 491 U.S. at 688 ("The standard is a subjective one — there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" (quoting *Garrison*, 379 U.S. at 74)); *St. Amant v. Thompson*, 390 U.S. 727, 731 (88 SCt 1323, 20 LE2d 262) (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.").

To meet this standard, Zeh may rely on circumstantial as well as direct evidence. See *Harte-Hanks*, 491 U.S. at 668. See also *Williams v. Trust Co. of Ga.*, 140 Ga. App. 49, 60 (230 SE2d 45) (1976) (noting that a publisher "is hardly likely to admit malice"). However, Zeh must prove actual malice not merely by a

47

preponderance of the evidence but by clear and convincing evidence, which is an "'extremely high'" standard of proof. *Cottrell*, 299 Ga. at 525 (citation omitted). See also *Rosser v. Clyatt*, 348 Ga. App. 40, 50 (821 SE2d 140) (2018) (applying the "clear and convincing" standard of proof to an anti-SLAPP motion to strike the public-figure plaintiff's defamation lawsuit); *Terrell v. Georgia Television Co.*, 215 Ga. App. 150, 152 (449 SE2d 897) (1994) ("A public official in a defamation action must show actual malice with convincing clarity, even on motion for summary judgment." (citation and punctuation omitted)). Thus, "courts must be careful not to place too much reliance on [circumstantial evidence of the defendant's state of mind]." *Harte-Hanks*, 491 U.S. at 668. "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law" — the focus of the court's independent examination of the whole record. Id. at 685.

In this case, Zeh contends that the defamation case pleadings and affidavits, viewed in his favor, prove that the ACLU published the blog post statements with reckless disregard for their accuracy.

He argues first that the author and editors of the post should not have relied on Cox's and Hamilton's claims against Zeh in the federal case filings because Cox's allegations were not trustworthy. In addition, Zeh argues that the ACLU should have further investigated the allegations by reviewing the Glynn County court records relating to Cox's 2015 case and contacting Zeh before publishing the blog post. Neither argument is persuasive.

First, the blog post author's and editors' reliance on the federal case filings does not demonstrate that the post was published recklessly. Those filings, which included the motion to amend the complaint, the proposed amended complaint, and Cox's and Hamilton's declarations, alleged consistently that Zeh had charged Cox and Hamilton a $2,500 fee to represent Cox, who was indigent, as his public defender in a misdemeanor case. Each document was filed in the federal court by Woods, the lead ACLU Foundation lawyer for the federal case and an editor of the blog post, who pursuant to Federal Rule of Civil Procedure 11 certified under penalty of sanction by the federal district court that to the best of

her knowledge, information, and belief after a reasonable inquiry, the allegations against Zeh had evidentiary support and were not brought for an improper purpose.[23] And Cox and Hamilton each affirmed under penalty of perjury that the information in their declarations was true and correct. In addition, the blog post author and editors swore in their affidavits in the defamation case that they had no knowledge, information, or belief that any of the statements in the post, which were based on these federal court filings, were false. See, e.g., *Torrance v. Morris Publishing Group, LLC*, 289 Ga. App. 136, 137-139 (656 SE2d 152) (2007) (explaining that the public-official plaintiff failed to show that the allegedly defamatory statements were published with actual malice, partly because the

---

[23] Rule 11 (b) says in pertinent part that by presenting to the court a pleading, written motion, or other paper, an attorney "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" And Rule 11 (c) provides for the court, on motion of a party or the court's own motion, to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." There is no indication that Zeh requested, or that the federal district court imposed, any sanctions for unsupported factual allegations in the proposed amended complaint or the declarations that were filed with it.

authors of the statements presented sworn affidavits that they had "reported . . . information provided by an identified source and had no reason to believe the information provided was false").

Moreover, the defamation case pleadings and affidavits show that at the time the ACLU published the blog post, it *knew* information that supported Cox's allegations, but *did not know* information indicating that the allegations were false. Significantly, Cox's claims about Zeh did not come out of the blue. Rather, his allegations on behalf of the proposed plaintiff classes were generally consistent with the other class representatives' allegations in the original federal complaint about Zeh and his practice of ignoring indigent defendants — allegations that Zeh hardly mentioned in his defamation complaint or in his briefing here. Notably, when the blog post was published, Zeh had not yet filed in the federal case his response to the proposed amended complaint denying Cox's and Hamilton's allegations or presented any evidence indicating that their claims were inaccurate. See footnote 11 above.

Zeh points out, and the Court of Appeals noted, see *Zeh*, 355

Ga. App. at 736 n.19, that Cox's declaration said that the ACLU Foundation lawyers in the federal case refreshed his memory with "a handful of [his] court records." But the declaration indicates that the records the lawyers showed him did not include those relating to the 2015 shoplifting case (which could have informed the ACLU that Cox's allegations could be false because the court records for that case indicated that Zeh did not enter an appearance as Cox's lawyer until after the case was transferred to the Superior Court to be prosecuted as a felony). According to the declaration, the records that the lawyers used to refresh Cox's memory pertained to his later misdemeanor cases in 2016 and 2017, because he then described four of his cases during those two years "[b]ased on reviewing [the] records." Moreover, the ACLU Foundation lawyers' showing Cox only the records relating to his 2016 and 2017 charges is consistent with the allegations in the proposed amended federal complaint and in Cox's declaration that Cox was incarcerated for 171 days between June 2016 and May 2018 because he could not afford to pay bail. Simply put, the fact that the ACLU Foundation lawyers had

obtained and reviewed Cox's court records from 2016 and 2017 does not establish that the ACLU had obtained, reviewed, and purposely not presented the records relating to his 2015 shoplifting case at the time it published the blog post.

Asserting that Cox's allegations in the federal case should have put the ACLU on notice that he was not trustworthy, Zeh asserts that Cox was "an admitted alcoholic with a long criminal record that he could not fully remember." Cox did openly admit his struggles with alcoholism, but that issue would not make him inherently untrustworthy. As for his criminal record, Cox's declaration did not indicate that he had any prior convictions (or even arrests) for felonies or crimes involving acts of dishonesty. Cf. OCGA § 24-6-609 (a) (generally allowing for impeachment of a witness's character for truthfulness by evidence of conviction of a felony or of any crime "if it readily can be determined that establishing the elements of such crime required proof or admission of an act of dishonesty or making a false statement"). And Cox did not indicate a lack of memory for *felony* cases against him, only that he "had been charged with

53

misdemeanors in Glynn County more times than [he could] remember." Indeed, a felony case would have been expected to stand out to Cox, because Zeh asserted in his defamation complaint that Cox had never been convicted of a felony and was particularly concerned with maintaining that record.

Cox's inability to recall the details of all of his misdemeanor cases does not establish that his claims about Zeh and the 2015 case should obviously have been disbelieved, particularly when those claims were corroborated in the declaration of Hamilton, who Zeh does not contend had any substance abuse or memory issues and who swore that Cox had told her the same story that he told in his declaration – that Zeh, who had represented Cox in misdemeanor cases numerous times before, had charged a $2,500 fee to represent Cox as his public defender on the occasion in question. The statements in Cox's declaration to which Zeh points were therefore insufficient to establish that the ACLU subjectively had a high degree of awareness of the probable falsity of Cox's allegations.

Nor does the ACLU's later refusal to retract the blog post

54

statements demonstrate that the ACLU entertained serious doubts about the truth of the statements at the time of publishing. See *Purvis*, 226 Ga. App. at 250. See also *New York Times*, 376 U.S. at 286. In sum, the defamation case pleadings and affidavits do not clearly and convincingly establish that at the time the post was published, the ACLU was subjectively aware that Cox's and Hamilton's claims were probably false. See *Jones*, 290 Ga. App. at 132 (explaining that "[t]he actual malice inquiry is based on what the writer knew when he wrote it").

Zeh also contends that the ACLU should have investigated whether Cox's allegations were true before referencing them in the blog post. Specifically, Zeh argues that the Court of Appeals correctly concluded that the ACLU "should have determined from public court records [regarding Cox's 2015 shoplifting case] whether there was any truth to Cox's contentions." *Zeh*, 355 Ga. App. at 736.[24]

---

[24] We note that this conclusion came in the course of the Court of Appeals' analysis of whether the ACLU acted with negligence under Georgia conditional-privilege law, rather than in properly applying the constitutional actual malice standard.

Zeh also asserts that the ACLU should have contacted him to "hear [his] side of the story" before publishing the blog post. Based on the record as it now stands, however, the ACLU's lack of investigation does not establish actual malice.

The United States Supreme Court has made clear that a publisher's "[f]ailure to investigate does not in itself establish bad faith." *St. Amant,* 390 U.S. at 733. See also *Gertz,* 418 U.S. at 332. Nor is the standard whether a "reasonably prudent person" would have investigated before publishing, *Harte-Hanks,* 491 U.S. at 688; instead, there must be a showing by clear and convincing evidence that the defendant "purposeful[ly] avoid[ed]" investigation with the intent to prevent discovering the truth, id. at 692-693.

In *New York Times*, for example, the Supreme Court held that the Times' failure to check the accuracy of false statements it had published in an advertisement against the news stories in the Times' *own files* supported "at most a finding of negligence in failing to discover the misstatements, and [wa]s constitutionally insufficient to show the recklessness that is required for a finding of actual

malice." 376 U.S. at 287-288. And in *St. Amant*, the Court concluded that St. Amant, a political candidate, did not act with actual malice when he made a speech repeating allegations in an affidavit from a union member regarding misconduct by a deputy sheriff, even though St. Amant relied solely on the affidavit, he failed to verify the information with the union office, and "there was no evidence in the record of [the union member's] reputation for veracity." 390 U.S. at 728-733. The Court explained that the union member swore to his allegations publicly and in writing and "was prepared to substantiate his charges," he "seemed to St. Amant to be placing himself in personal danger by publicly airing the [allegations]," and St. Amant had verified other aspects of the union member's information. Id. at 733. The Court suggested, by contrast, that a publisher's reckless disregard for the accuracy of its statements may be inferred where, for example, "a story is fabricated by the [publisher], is the product of [its] imagination, or is based wholly on an unverified anonymous telephone call"; "the publisher's allegations are so inherently improbable that only a reckless man

would have put them in circulation"; or "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." Id. at 732.

Here, the existing record shows that the ACLU's statements in the blog post were not fabricated, imagined, or based wholly on an unverified source like an anonymous telephone call. Instead, the statements relied on pleadings and sworn declarations filed publicly in a federal court case, which were not inconsonant with information that the ACLU Foundation lawyers had previously gathered and alleged regarding Zeh and serious problems in the Glynn County misdemeanor public defense system. And as discussed above, at the time the ACLU published the blog post, it had no obvious reason to doubt Cox's and Hamilton's allegations. The ACLU may have acted imprudently, but the defamation case pleadings and affidavits do not establish by clear and convincing evidence that the ACLU's failure to review the State and Superior Court records for Cox's 2015 shoplifting case or to contact Zeh about the allegations evinced a deliberate intent to avoid discovering the truth. See *New York*

*Times*, 376 U.S. at 287-288; *St. Amant*, 390 U.S. at 732-733.[25]

Based on our independent review of the entire existing record of defamation case pleadings and affidavits, viewed in a light favorable to Zeh, we conclude that he has not shown by clear and convincing evidence that the ACLU actually disbelieved or subjectively entertained serious doubts about the truth of the disputed statements in its blog post. Accordingly, Zeh has not

---

[25] See also, e.g., *Jones*, 290 Ga. App. at 127, 132-133 (holding that a reporter's failure to fully investigate court records was insufficient to prove actual malice where the reporter examined the docket book listing the public-figure plaintiff's charges and guilty plea and reported that he pled guilty to a felony, but the plaintiff actually pled nolo contendere to a misdemeanor, because the reporter testified that he accidentally reported that the plaintiff had pled guilty rather than nolo contendere and because the only indication in the court records that the plaintiff pled guilty to a misdemeanor was a small handwritten note on the indictment); *Torrance*, 289 Ga. App. at 137, 140-141 (rejecting the public-figure plaintiff's claim that reporters wrote articles that "'presented a distorted interpretation'" of the facts, and noting that "[e]ven a total failure to investigate does not establish bad faith, and failure to investigate fully or to the degree desired by the plaintiff 'does not evince actionable reckless disregard'" (citation omitted)); *Terrell*, 215 Ga. App. at 151-152 (concluding that a reporter's failure to investigate a statement made by the public-official plaintiff's "political enem[y]" did not establish actual malice); *Brewer v. Rogers*, 211 Ga. App. 343, 345, 347-348 (439 SE2d 77) (1993) (holding in pertinent part that where a television reporter obtained information from two 15-year-old news articles and a court docket sheet and falsely said in a newscast that the public-figure plaintiff had been involved in a widespread gambling operation, the reporter's failure to investigate public records showing that the plaintiff was not involved in a large gambling scheme, but rather a "small-time" operation, did not amount to actual malice).

established a probability of prevailing on his defamation claim under the second part of the anti-SLAPP test, see *Wilkes*, 306 Ga. at 262; the trial court erred in denying the ACLU's anti-SLAPP motion to strike Zeh's lawsuit; and the Court of Appeals erred in affirming that ruling.

5. *Zeh's motions requesting discovery.*

That conclusion does not fully resolve this case, however. As we mentioned in recounting the procedural history of this case in Division 2 (d), along with his response to the ACLU's anti-SLAPP motion to strike, Zeh filed a motion for discovery, arguing that to the extent the trial court found that he was a "public figure," the parties should conduct discovery on the issue of whether the ACLU published the blog post statements with actual malice. See OCGA § 9-11-11.1 (b) (2) ("[I]f there exists a claim that the nonmoving party is a public figure plaintiff, then the nonmoving party shall be entitled to discovery on the sole issue of actual malice whenever actual malice is relevant to the court's determination under paragraph (1) of this subsection."). And in November 2018, shortly

after the hearing on the motion to strike, Zeh filed another motion to conduct discovery by deposing Cox and Hamilton as well as the author and editors of the blog post, arguing that he had shown good cause because the memories of those individuals "[were] fading while the [c]ourt t[ook] the [d]efendants' motions to [strike] under advisement." See OCGA § 9-11-11.1 (d) ("The court, on noticed motion and for good cause shown, may order that specified discovery or other hearings or motions be conducted notwithstanding this subsection [generally staying discovery until a final decision on a motion to strike]."). The trial court summarily denied the motion to strike without ruling on either discovery motion.

If the trial court had *correctly* ruled that the motion to strike should be denied based on the existing defamation case pleadings and affidavits, then Zeh's motions for discovery under OCGA § 9-11-11.1 would be moot, because if his defamation claim was not struck, the case would proceed to ordinary civil discovery. However, we have concluded that the trial court *erred* in denying the motion to strike based on the current record. And we cannot say as a matter of law

61

that the discovery requested could not lead to additional evidence that would support Zeh's defamation claim and make granting the ACLU's motion to strike improper. Cf. *Dodson v. Sykes Industrial Holdings, LLC*, 324 Ga. App. 871, 875-876 (752 SE2d 45) (2013) (explaining that a trial court generally should not grant summary judgment "'while a motion to compel discovery is pending, unless it can be determined that the disallowed discovery would add nothing of substance to the party's claim'" (citation omitted)).

For example, the record as it now stands indicates that when the ACLU published the disputed blog post statements, it did not possess a high degree of subjective awareness that Cox's and Hamilton's allegations were probably false, but discovery on this issue could conceivably uncover admissions by the post's author and editors or other evidence from Cox and Hamilton showing that the ACLU actually knew or entertained serious doubts about the accuracy of the statements. If Zeh obtained and presented such additional evidence, he potentially could defeat the ACLU's anti-SLAPP motion to strike. Accordingly, while we reverse the Court of

62

Appeals' judgment upholding the denial of the anti-SLAPP motion to strike based on the existing record, we remand the case to that court with direction to remand the case to the trial court to rule on Zeh's discovery motions and then proceed in a manner consistent with this opinion.[26]

*Judgment reversed and case remanded with direction. All the Justices concur, except McMillian and Colvin, JJ., disqualified.*

---

[26] We note that while the trial court has *discretion* under OCGA § 9-11-11.1 (d) to determine whether Zeh has shown "good cause" for discovery and, if so, what discovery should then be "specified," under OCGA § 9-11-11.1 (b) (2), a plaintiff who the anti-SLAPP movant claims is a "public figure plaintiff" is *entitled* to discovery on the "sole issue of actual malice." In this Court, the ACLU argues that it has alleged only that Zeh is a "public official," not a "public figure," so OCGA § 9-11-11.1 (b) (2) does not apply in this case. It is true that "public official" and "public figure" are terms often used separately in the case law following *New York Times*, see, e.g., *Gertz*, 418 U.S. at 343-345; *Ellerbee*, 262 Ga. at 516-517. But the case law also sometimes appears to treat "public officials" (the original type of defamation plaintiffs to which the constitutional actual malice test was applied in *New York Times*) as a subset of "public figures" (the category of defamation plaintiffs to which that test was extended in *Curtis*), and the same actual malice test applies to "public figures" and "public officials." See, e.g., *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271 (91 SCt 621, 28 LE2d 35) (1971). Put another way, all "public officials" may be "public figures," even though all "public figures" are not "public officials." In any event, we did not grant certiorari in this case to decide this question, so we leave it to the trial court to decide in the first instance on remand whether the ACLU claims that Zeh is a "public figure plaintiff" as that term is used in OCGA § 9-11-11.1 (b) (2).

Decided October 19, 2021.

Certiorari to the Court of Appeals of Georgia — 355 Ga. App. 731.

*John P. Batson; Gordon Rees Scully Mansukhani, Leslie K. Eason, Tiffany N. Taylor; Sean J. Young, Brian M. Hauss, Andres M. Lopez-Delgado*, for appellant.

*Savage Turner Pinckney & Savage, Brent J. Savage, Kathryn H. Pinckney*, for appellee.

*Robbins Ross Alloy Belinfante Littlefield, Joshua B. Belinfante; Clare R. Norins*, amici curiae (appellant).